**FRANKLIN SAVINGS CORPORATION
and Franklin Savings Association,
Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 98–697 C.

United States Court of Federal Claims.

June 16, 2003.

escapades through the world of federal courts. Despite vainly prosecuting myriad legal claims in every conceivable forum and fruitlessly propounding inventive and novel legal theories, plaintiffs have continually stared down the face of defeat, personifying Mason Cooley's aphorism, "if you at first don't succeed, try again, and then try something else."

Plaintiffs are comprised of Franklin Savings Association (FSA)—now a defunct Kansas savings and loan institution (S & L)—which was seized and liquidated by the government during the S & L crisis of the late 1980s, and Franklin Savings Corporation (FSC) which is the record holder of approximately 94% of the issued and outstanding guarantee stock of FSA.[1] The operative facts surrounding the seizure and liquidation have served as the predicate for nearly a baker's dozen different actions, which include both judicial and administrative proceedings, each and every one of which Franklin lost.

Franklin unsuccessfully litigated three times in the Kansas District Court. *Franklin Sav. Ass'n v. Office of Thrift Supervision*, 742 F.Supp. 1089 (D.Kan.1990) *rev'd and vacated* 934 F.2d 1127 (10th Cir.1991); *Franklin Sav. Ass'n v. Office of Thrift Supervision*, 821 F.Supp. 1414 (D.Kan.1993); *Franklin Sav. Ass'n v. United States*, 970 F.Supp. 855 (D.Kan.1997). Taking its namesake' Benjamin Franklin's words to heart, Franklin appealed those decisions to the U.S. Court of Appeals for the Tenth Circuit. The yield of these appeals were barren. *Franklin Sav. Ass'n v. Office of Thrift Supervision*, 934 F.2d 1127 (10th Cir.1991), *cert denied*, 503 U.S. 937, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992) (*Franklin I*); *Franklin Sav. Ass'n v. Office of Thrift Supervision*, 35 F.3d 1466 (10th Cir.1994), *cert denied*, 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999) (*Franklin II*); *Franklin Sav. Ass'n v. United States*, 180 F.3d 1124 (10th Cir.1999), *cert denied*, 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999) (*Franklin III*).

Having exhausted the Tenth Circuit, Franklin tried another route: the bankrupt-

R. Pete Smith, McDowell, Rice, Smith & Garr, Kansas City, Missouri, argued for the plaintiff. Jonathan A. Margolies and Jerry Strouck of counsel.

Luke Levasseur, Commercial Litigation Branch, Civil Division, United States Department of Justice, argued for the defendant.

### OPINION AND ORDER

BLOCK, Judge.

Benjamin Franklin once said "I haven't failed, I've found 10,000 ways that don't work." These words encapsulate plaintiffs'

1. FSA and FSC will be interchangeably and collectively referred to as the singular "Franklin" for simplicity's sake, unless it is necessary to refer to the individual corporate entities. In such a case, FSA or FSC will be used.

cy court. This too resulted in defeat. Realizing that Franklin was relitigating the same claims averred in prior proceedings dressed up in different garb, the bankruptcy court shattered Franklin's endeavors on the rock of *res judicata*. *Franklin Sav. Corp. v. United States (In re Franklin Sav. Corp.)*, 2002 Bankr.LEXIS 1583 (Bankr.D.Kan.2002).

Meanwhile, prior to the outcome of the bankruptcy proceeding, the ever resourceful Franklin commenced the present suit in this court, essentially reiterating the same facts previously litigated in *Franklin I, II, III*, and alleged in the bankruptcy court, this time asserting an action under the Tucker Act, 28 U.S.C. § 1491 (2000), for breach of contract, breach of fiduciary duty, and a taking under the Fifth Amendment to the United States Constitution. Having previously rejected Franklin's takings claim, *Franklin Sav. Corp. & Franklin Sav. Ass'n v. United States*, 46 Fed.Cl. 533 (2000), this court is now asked by defendant to enter summary judgment in its favor on the remaining claims pursuant to Court of Federal Claims Rule 56. Also before the court are Franklin's cross-motion for summary judgment and their motion to reconsider the dismissal of the takings claim, pursuant to Court of Federal Claims Rule 59. Proving that the maxim "practice makes perfect" is not always a truism, for the reasons stated below, defendant's motion is granted and Franklin's motions are denied.

## I. Facts

From 1889 to 1973, Franklin was a state chartered savings and loan institution which engaged in the traditionally profitable practice of accepting depositors' money and then investing that money at a higher rate of return.[2] Although FSA had been in existence for nearly a century, the history of this litigation began in the early 1970s when the seeds for the now infamous savings and loan scandals were being planted. In 1973, FSA set upon a course of expansion by going public and then opening several new branches nation-wide over the next eight years. In 1981 it began investing in mortgage-backed securities,[3] including "deep discount" securities which are not ultimately guaranteed by the federal government. FSA also began investing in high-yield bonds, commonly referred to as "junk bonds." This strategy of investment, in conjunction with the general decrease in interest rates occurring in early 1980s, led to a volatile and unpredictable income stream for FSA. Moreover, since more than 35% of FSA's assets were high risk securities and junk bonds, FSA itself became volatile.

Despite this volatility, FSA began soliciting brokered deposits. These deposits were typically "short term," which meant that FSA had to be capable of quickly turning assets into cash in order to pay depositors. The deposits were also costly since FSA had to pay brokerage fees. By 1989, over 70% of FSA's deposits were brokered.

By 1990, FSA had attracted the attention of the Director of the Office of Thrift Supervision (OTS).[4] The Director of the OTS (the Director) was concerned with Franklin's earnings as well as with its capital structure in general. As for the former, Franklin exhibited a downward trend in earnings, incurring a $58 million loss over a fifteen-month period ending in December 1989, and a $9 million loss during fiscal year of 1989. Also

---

2. The facts, unless otherwise noted, are undisputed and are drawn from the complaint, defendant's motion for summary judgment, Franklin's motion in opposition, and the appendices attached thereto. Facts are also drawn from the Tenth Circuit's opinions in *Franklin I–III*.

3. A mortgage backed security is a security in which the creditor is entitled to payments (cash flow) from a pool of mortgage loans secured by real estate.

4. The OTS was created by the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183–553 (1989) (codified at 12 U.S.C. § 1461 *et seq.*)

(FIRREA). FIRREA was passed in response to the savings and loan crisis and, *inter alia*, delegated to the Director of the OTS considerable discretionary power to regulate S & L's the Director believed were ailing. Among the more powerful tools of the Director was the ability to appoint the Resolution Trust Corporation (RTC), also a creation of FIRREA, as a conservator of an S & L. A conservator essentially assumes control of the S & L's business and has "all the powers of the members, the stockholders, the directors, and the officers of the association and shall be authorized to operate the association in its own name or to conserve its assets in the manner and to the extent authorized by the Director." 12 U.S.C. § 1464(d)(2)(E)(i) (2000).

by 1989, Franklin's tangible capital had decreased by nearly $13 million, and its net interest margin shrank to less than one percent of its total assets. In terms of capital structure, the Director was also concerned that Franklin was issuing increasing numbers of letters of credit, and was unsuccessful at raising new outside capital.

In light of Franklin's earnings and capital structure, the Director ordered three write-downs of Franklin's capital: (1) a $47 million write-down to reflect the risks of Franklin's increased issuance of letters of credit, (2) a $9 million write-down to reflect Franklin's cash losses, and (3) a $185 million write-down to reflect the risk of default on Franklin's $3 billion of outstanding bonds. In addition, pursuant to FIRREA, the Director appointed the RTC as conservator in February of 1990 after finding that Franklin was in an unsafe and unsound condition to transact business. *See* 12 U.S.C. § 1821(c)(5)(c) (2000). The conservatorship remained in effect until July 16, 1992 when, pursuant to then section 1464(d)(2)(F) of FIRREA, the Director replaced the conservator with a receiver who ultimately liquidated Franklin's assets. As discussed in more detail below, the appointment of the conservator and the actions of the receiver have been the predicate for Franklin's claims in the legion of courts in which it has litigated, including this one.

## A. *Franklin I*

Franklin's mass litigation odyssey began on March 12, 1990 when it filed an eight-count complaint in the U.S. District Court for the District of Kansas (Topeka) (Kansas District Court). Franklin alleged that the Director's disallowance of certain accounting practices performed by Franklin was illegal. More specifically, Franklin contended that its "Hedge Correlation Analysis Methodology" comported with generally accepted accounting principles (GAAP)—the gold standard in the accounting world—and that the Director's decision to the contrary was made in bad faith and was arbitrary and capricious. On the specifics of Franklin's Hedge Correlation Analysis Methodology it is not necessary to expound, suffice it to say, that it was Franklin's way of accounting for gains, losses, interests in futures, deferments, and amortization. Based on this accounting policy, Franklin contended in the complaint that it was not only compliant with GAAP, but that it was fiscally sound during all relevant periods, including the time at which the conservator was appointed.

Several pages of the complaint in *Franklin I* are reasserted verbatim before this court in the present complaint. Two excerpts from those pages are particularly relevant to this opinion. The first appears in the introduction of the complaint and reads:

[t]he defendant's disallowance of certain accounting practices at Franklin was not based on any duly promulgated, uniform accounting regulation, as required by FIRREA, but rather on defendant's *ad hoc* change of position as to those practices. This change in position lacks any rational basis, and the defendant's arbitrary decision to apply this new view of acceptable accounting practice retroactively to prior financial reporting periods is unlawful and nothing more than an attempt to create some basis for their predetermined takeover of Franklin.

*Franklin I* Compl. at 4. A second excerpt, found in Count IV of the complaint, reads: "[i]t was arbitrary and capricious, and an abuse of discretion for the defendants to change their views on specific application of GAAP accounting...." *Franklin I* Compl. at 34.

These allegations became the primary issues during an eighteen-day trial taking place between June 25, and July 20, 1990. The Kansas District Court ruled in favor of Franklin after making 209 findings of fact and eighteen conclusions of law. *Franklin Sav. Ass'n*, 742 F.Supp. 1089. The district court's opinion considered all relevant evidence, including evidence outside of the OTS' findings in the administrative record. In so doing, the district court heard extensive expert testimony on the intricacies of Franklin's Hedge Correlation Analysis Methodology and concluded that it indeed comported with GAAP. *Id.* at 1112. As a result, the court held that FIRREA's statutory grounds for the appointment of a conservator had not been satisfied, and therefore the director's

decision to impose a conservatorship on Franklin "lacked any basis in fact and was arbitrary and capricious...." *Id.* at 1129.

The district court's opinion, however, was sharply criticized and reversed and vacated by the Tenth Circuit Court of Appeals. *Franklin Sav. Ass'n,* 934 F.2d 1127. The Tenth Circuit held that both the standard of review and the scope of review applied by the district court were incorrect. As for the scope of review, the appellate court held that it was limited to the administrative record in front of the director at the time of his decision to appoint a conservator. *Id.* at 1140. That conclusion was bolstered by Congress' intent in passing FIRREA to give the director substantial discretion, as well as the ability to act promptly in appointing conservators to failing S & Ls:

> We first emphasize that FIRREA establishes that the determination of whether the statutory grounds to appoint a conservator exist lies in the province of the *director's opinion....* Congress did not mandate a hearing or specific findings of fact to be made; rather, it required only the director be of the opinion statutory grounds for appointment of a conservator exist.... Congress made clear it expects the director to be vigilant and responsive. FIRREA's statutory scheme, the specific statute at issue, and the legislative history, all agree it is essential the director act promptly in appointing a conservator once he is of the opinion that a statutory ground

exists. The close supervision, broad discretion, and quick response directed by FIRREA dictates a narrow and limited scope of review that gives great deference to the director's judgement, knowledge, and expertise.

*Franklin Sav. Ass'n,* 934 F.2d at 1137–1140 (emphasis original) (citations omitted).

The Circuit concluded that the Kansas District Court went well beyond the administrative record by hearing live testimony from twenty-five witnesses, accepting deposition testimony from eighteen witnesses, and receiving 650 trial exhibits. As the Tenth Circuit put it, the district court "basically made its own findings, compared those to the findings of the Director, and decided the conservator was wrongly appointed. Such a review was far beyond the court's permissible scope of review." *Id.* at 1140.

It was for similar reasons that the Tenth Circuit held the district court applied the wrong standard of review. The proper standard of review, the Circuit held, was an arbitrary and capricious standard under section 706 the Administrative Procedure Act (APA).[5] *See* 5 U.S.C. § 701 *et seq.* (2000).[6] Although the district court purported to apply this standard, its actions at trial demonstrated to the appellate court that it was actually conducting a *de novo* review of the Director's decision:

> [Q]uite simply stated: the district court ignored the data contained in the adminis-

---

**5.** The Tenth Circuit followed precedent from the Fifth and Eighth Circuits which had interpreted similar language as that in FIRREA and also determined ·that the arbitrary and capricious standard of review was proper. *See Woods v. FHLBB,* 826 F.2d 1400, 1407 (5th Cir.1987); and *Guaranty Sav. & Loan Ass'n v. FHLBB,* 794 F.2d 1339, 1342 (8th Cir.1986).

**6.** Section 706 of the APA provides for judicial review of agency decisions, and reads as follows:
> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

trative record and Director's concerns; substituted its judgment for that of the Director's concerning the acceptable level of [ ] high risk assets; ignored the predictive judgment of Director that a sale of these assets would likely result in a loss; and afforded no deference to Director's knowledge and expertise. Again, the district court, while using language employed in the proper arbitrary and capricious standard, in fact applied a *de novo* standard of review.

*Franklin Sav. Ass'n,* 934 F.2d at 1144.

Refusing to remand, the appellate court itself reviewed the Director's decision under the proper scope and standard of review.[7] *Id.* at 1142. In its review of the administrative record, it focused on whether there was adequate evidence to support the Director's finding that one of three statutory grounds for appointing a conservator existed at the time of appointment. The first ground under FIRREA is an "unsafe or unsound condition to transact business" under 12 U.S.C. § 1464(d)(2)(A) (2000) and 12 U.S.C. § 1821(c)(5) (2000). In upholding the Director's finding that Franklin was in an unsafe and unsound business condition, the Tenth Circuit noted the Director's finding that over 40% of Franklin's assets were high risk and "subject to extreme price volatility, interest rate risk, as well as significant prepayment risk." *Franklin Sav. Ass'n,* 934 F.2d at 1143. In addition, the administrative record also showed that Franklin would likely face significant losses, and in the event of such losses, would be unable to successfully liquidate its assets due to the thin secondary market for high risk investments. *Id.*

Although the Director need find only one statutory ground under FIRREA to justify appointing a conservator, the Tenth Circuit nevertheless reviewed the Director's second statutory ground for appointing a conservator under FIRREA—whether Franklin had "incurred or [was] likely to incur losses that will deplete all or substantially all of its capital." *See* 12 U.S.C. § 1464(d)(2)(A) (2000); *and* 12 U.S.C. § 1821(c)(5) (2000). The record in this respect was replete with evidence of declining capital, including that "Franklin's net income margin had steadily and progressively declined from 2.34% as of June 30, 1984 to .94% on June 30, 1990. Franklin, by its figures, had a $9 million loss from June 30, 1988 to June 30, 1989[and] was paying dividends and large bonuses notwithstanding the loss." *Franklin Sav. Ass'n,* 934 F.2d at 1146.

Finally, the Tenth Circuit reviewed the Director's third statutory ground for appointing a conservator—whether Franklin was in "violation or violations of laws or regulations, or an unsafe or unsound condition which is likely to cause either insolvency or substantial dissipation of assets or earnings, or is likely to weaken the condition of the association or otherwise seriously prejudice the interests of its depositors." *See* 12 U.S.C. § 1464(d)(2)(A) (2000); *and* 12 U.S.C. § 1821(c)(5) (2000). The court looked to much the same evidence supporting the first two grounds, noting that the record indicated Franklin's interest margin had been steadily decreasing, its operating trends showed a high likelihood of foreseeable future losses, and an inability of Franklin to raise new outside capital. *Franklin Sav. Ass'n,* 934 F.2d at 1148. As a result, the court held that the Director had a rational basis for his finding, and therefore did not act arbitrarily and capriciously.[8] *Franklin Sav. Ass'n,* 934 F.2d at 1149.

---

7. This act of assuming the district court's role was based on established Tenth Circuit case law applicable to situations in which the district court's decision is appealed. *See Webb v. Hodel,* 878 F.2d 1252, 1254 (10th Cir.1989) (holding that where a district court's review is appealed, the appellate court "must render an independent decision on the basis of the same administrative record as that before the district court; the identical standard of review is applied at both levels; and once appealed, the decision of the district court is afforded no particular deference").

8. In *dictum,* the court addressed the disagreement between the Director and Franklin as to whether Franklin's Hedge Correlation Analysis Methodology complied with GAAP: "[w]hile both competing accounting standards were in accordance with GAAP, the district court failed to give the appropriate deference to the standards specified by Director, stating only that Director's standards were 'extremely conservative.' Basically, the district court found the Director's decisions arbitrary based upon competing expert testimony and gave no deference whatsoever to Director's expertise and predictive judgments." *Franklin*

**B.** *Franklin II*

On July 16, 1992, the Director ordered that the conservator of Franklin be replaced by a receiver in order to liquidate Franklin's assets.[9] Franklin promptly filed another complaint nearly identical to that seen in *Franklin I* alleging, *inter alia*, the replacement violated FIRREA, and the Due Process Clause of the Fifth Amendment to the United States Constitution. Ostensibly disregarding the Tenth Circuit's conclusion that the Director did not act in bad faith or arbitrarily and capriciously, Franklin's complaint in *Franklin II* included the following excerpts which are relevant to the case *sub judice*:

The conservatorship and subsequent receivership was imposed by the defendant, with no prior notice or opportunity to be heard on the propriety or necessity of such action, based on the defendant's unlawful, arbitrary and capricious, and retroactive disallowance of specific accounting practices, which had been reviewed without adverse comment in Franklin's previous regulatory examination. *The defendant's disallowance of certain accounting practices at Franklin was not based on any duly promulgated, uniform accounting regulation, as required by FIRREA, but rather on defendant's ad hoc change of position as to those practices. This change in position lacks any rational basis, and the defendant's arbitrary decision to apply this new view of acceptable accounting practice retroactively to prior financial reporting periods is unlawful and nothing more than an attempt to create some basis for their predetermined takeover of Franklin.*

*Franklin II* Compl. at 3.[10]

Several pages later, citing as authority the reversed and vacated district court opinion in

*Franklin I*, Franklin alleged that the Director's appointment of the receiver was "arbitrary, capricious, and an abuse of discretion [because] the OTS [was] attempt[ing] to cleanse the unlawful nature of its prior conduct, including but not limited to the appointment of the conservator..." *Franklin II* Compl. at 12. Seemingly undaunted by controlling precedent, Franklin further asserted exactly the same claims as those rejected by the Tenth Circuit in *Franklin I*, to wit:

the defendant's decision to impose the conservatorship and receivership on Franklin was not based on legitimate or proper regulatory concerns. Its decision was arbitrary, capricious and an abuse of discretion. The defendant's action in imposing the conservatorship or receivership on Franklin was unlawful because its stated reasons are legally and factually insupportable.

*Franklin II* Compl. at 4.[11]

The government moved to dismiss the complaint under Rule 12 of the Federal Rules of Civil Procedure arguing that FIRREA precluded judicial review of the Director's decision to replace the conservator with a receiver. The district court's analysis began and ended with the plain language of the statute which reads "no court may take any action for or toward the removal of any conservator or receiver or, except at the request of the Director, to restrain or affect the exercise of powers or functions of a conservator or receiver." 12 U.S.C. § 1464(d)(2)(D) (2000); *Franklin Sav. Ass'n*, 821 F.Supp. at 1421 (citing *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391, 397–398 (1992) ("Courts must presume that a legislature says in a statute what it means and means in

---

*Sav. Ass'n*, 934 F.2d at 1149 (internal citations omitted).

**9.** The difference between a conservator and a receiver lies primarily in the added ability of the receiver to liquidate a failing S & L's assets. *See* 12 U.S.C. § 1821(d)(2)(E)(ii) (2000); *see also Gross v. Bell Sav. Bank PaSA*, 974 F.2d 403, 407 (3rd Cir.1992); *Resolution Trust v. CedarMinn Bldg. Ltd. Partner.*, 956 F.2d 1446, 1454 (8th Cir.1992), *cert. denied*, 506 U.S. 830, 113 S.Ct. 94, 121 L.Ed.2d 56 (1992).

**10.** The italicized portions denote language taken verbatim from the complaint in *Franklin I*.

**11.** That Franklin's complaints were nearly identical did not escape the district court in *Franklin II*: "as revealed by their complaint, plaintiffs simply want a chance to relitigate again the same issues and to present the same evidence that was heard by Judge Saffels." *Franklin Sav. Ass'n*, 821 F.Supp. at 1424.

a statute what it says there.")). Moreover, the court could find no evidence of legislative intent contrary to the plain meaning of the provision. *Franklin Sav. Ass'n,* 821 F.Supp. at 1421.

The district court also dismissed Franklin's Due Process claim. In light of applicable Supreme Court precedent, the district court held that the government has a compelling interest in regulating the banking industry, and that courts have generally not imposed any additional Due Process requirements in the banking context beyond those statutorily specified by Congress. *Franklin Sav. Ass'n* 821 F.Supp. at 1422 (citing *Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947); *cf. FDIC v. Mallen,* 486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988)). Moreover, the government's compelling interest in regulating the banking industry outweighed Franklin's interests, especially since Franklin's financial strength was due largely to the fact that the Federal Deposit Insurance Corporation (FDIC) guaranteed Franklin's deposits. As the district court stated "[w]hen [Franklin] and its owners accepted these benefits from federal insurance, they knew what came with them—extensive regulation, continuous federal scrutiny, and the chance of their institution being seized and placed into conservatorship or receivership." *Franklin Sav. Ass'n,* 821 F.Supp. at 1423.

The Tenth Circuit Court of Appeals affirmed, seizing primarily on FIRREA's statutory prohibition on judicial review. The court focused on section 1464(d)(2)(C) of FIRREA stating:

> [T]he Director may, without any prior notice, hearing, or other action, replace a conservator with another conservator or with a receiver, but such replacement shall not affect any right which the association may have to obtain judicial review of the original appointment, except that any removal under this subparagraph shall be removal of the conservator or receiver in office at the time of such removal.

12 U.S.C. § 1464(d)(2)(C) (2000). In light of this section, and section 1464(d)(2)(D) relied on by the district court, the Tenth Circuit held judicial review was only available for the Director's initial decision to appoint a conser-

vator, but not his subsequent decision to replace that conservator. *Franklin Sav. Ass'n,* 35 F.3d at 1470.

The appellate court likewise affirmed the district court's dismissal of Franklin's Due Process Claim holding that the process afforded for challenging the Director's initial appointment of a conservator or receiver was constitutionally sufficient. *Franklin Sav. Ass'n,* 35 F.3d at 1471. Moreover, the Director's decision to replace a conservator with a receiver worked no additional property loss to Franklin since Franklin and its stockholders were fully divested of their property at the point the conservator was appointed. *Id.* The mere act of replacing the conservator with a receiver did not change Franklin's property interest in the remaining assets, and could in fact work to Franklin's advantage since its stockholders would be the recipients of any proceeds of the liquidation. *Id.*

In addition, and particularly relevant to this court, the Tenth Circuit gave a litany of remedial alternatives to Franklin which guaranteed it due process:

> [W]e are satisfied with the limited procedure available to associations in the appointment and replacement of conservators and receivers. Our comfort in upholding FIRREA's denial of judicial review of the replacement comes from the possible availability of redress if the Resolution Trust Corporation mismanages a liquidation or improperly liquidates a savings and loan. The Administrative Procedure Act protects from agency action that is arbitrary and capricious or in bad faith. The Federal Tort Claims Act waives sovereign immunity to hold the government liable for tortious, nondiscretionary actions. The Tucker Act accommodates nontort claims under $10,000.

*Franklin Sav. Ass'n,* 35 F.3d at 1472 (citations omitted). As discussed more fully below, although Franklin had lost its APA claim in *Franklin I,* it took what it could of the Tenth Circuit's advice and filed both a Federal Tort Claims Act suit, and a Tucker Act suit.

## C. *Franklin III*

Having lost but learned from *Franklin II*, Franklin again appeared in Kansas District Court contending the RTC's actions as conservator and receiver violated the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (2000) (FTCA).[12] The complaint in *Franklin III*, although restating the same facts, differed from Franklin's prior complaints since Franklin's complaint was with the actions of the Receiver post-appointment, rather than with the Director's decisions to appoint or replace the conservator. Although Franklin asserted several theories of recovery in its FTCA claim, this court is most concerned with its breach of fiduciary duty claim which alleged that the failures of the RTC outlined below were tortious breaches of fiduciary duties actionable under the FTCA:

[1] Failure to maintain deposit base on both retail and brokered basis. . . .

[2] Fail[ure] to take steps to ensure that asset integrity and value were maintained and fail[ure] to maximize value in the timely and efficient disposition of the [high yield] bonds.

[3] Failure to challenge, and actually agreeing to, OTS mandated adjustments [the write-downs] even though FSA's accounting methods were consistent with GAAP. . . .

[4] Fail[ure] to maximize value in the timely and efficient disposition of securities. . .

[5] Failure to repudiate timely disadvantageous contracts, including, but not limited to, the $2.9 billion zero coupon bond issuance of 1984. . . .

[6] Failure to repurchase at market debt trading at less than par. . . .

*Franklin III*, Second Am. Compl. at 17–24.

The district court commenced its analysis by noting that because of the doctrine of sovereign immunity, the court would not have subject matter jurisdiction over Franklin's claim unless the government clearly waived its immunity under the explicit terms of the FTCA. On this basis, the government argued that the so called "discretionary function exception" applied, which dictates that there is no waiver of sovereign immunity for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a) (2000). To determine the exception's applicability, the court applied the prevailing two-part test assessing: (1) whether the act challenged involves an element of judgment or choice, and (2) whether the judgment or choice involved is one which Congress intended to shield—i.e., is one that the judiciary should not second-guess because it is based on social, economic, or political policy. *Berkovitz v. United States*, 486 U.S. 531, 536–547, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

In finding that the RTC's actions were shielded by the discretionary function exception, the court focused primarily on the first prong of the test. Franklin argued that the RTC's own regulatory manuals and directives restricted the RTC's choices and judgments—and hence its discretion—in conducting Franklin's affairs. Upon closer analysis, however, the court found these regulations and directives to be broad, precatory guidelines which implicitly and explicitly gave the RTC wide discretion in acting as a conservator or receiver. In addition, Franklin's argument that the RTC failed to consider pertinent fiscal and market information when making its decisions was also rejected since "the failure to consider some or all critical aspects of a discretionary judgment does not make that judgment less discretionary and does not make the judgment subject to liability." *Franklin Sav. Ass'n*, 970 F.Supp. at 866 (citing *Kiehn v. United States*, 984 F.2d 1100, 1105 (10th Cir.1993)).

---

12. *Franklin III* actually began in the Kansas Bankruptcy Court where Franklin had filed for Chapter 11 more than a year earlier. In that proceeding, Franklin asserted an adversary action seeking damages under the FTCA for negligence, breach of fiduciary duty and conversion. The adversary proceeding was transferred to the Kansas District Court, and later partially transferred to this court where it ultimately gave rise to the dispute *sub judice.*

As for the second prong of the discretionary function analysis, the district court notably observed:

> ... [F]ederal regulators owe their allegiance to depositors and the general public. If private financial institutions could sue regulatory agencies for negligently performing discretionary functions, the ability of those agencies to act in the public's best interest would be compromised. Sanctioning such suit also would put the courts in the difficult, if not impossible, position of judging the propriety of the policymaking acts of a coordinate branch.

*Franklin Sav. Ass'n*, 970 F.Supp. at 866.

Finding both requirements for the discretionary function exception were satisfied, the district court dismissed Franklin's complaint. *Franklin Sav. Ass'n*, 970 F.Supp. at 868.

The district court's dismissal of the FTCA claim was affirmed on appeal by the Tenth Circuit. The appellate court applied the controlling two-prong analysis, and accepted the district court's finding that the RTC's internal regulations and policy directives were precatory and broad suggesting the RTC was well within its discretion in performing the actions Franklin complained of. More important to this court, however, is the Tenth Circuit's holding regarding the purpose of the FTCA and the discretionary function exception:

> [The FTCA's] purpose is not to facilitate judicial second guessing of executive decision making. Such second-guessing is, instead, the point of the APA, which Congress enacted in the same year as the FTCA. Given the statutes' diametrically opposed yet complimentary purposes, it is sensible to allow judicial inquiry into bad faith and subjective decision making in a few exceptional circumstances under the APA, but to ban all FTCA suits that necessitate that peculiarly disruptive inquiry.

*Franklin Sav. Ass'n*, 180 F.3d at 1139–1140 (internal citations omitted).

### D. *The Bankruptcy Court's Decision*

On February 8, 2000, Franklin filed an adversary complaint in the United States Bankruptcy Court for the District of Kansas. The bankruptcy court dismissed Franklin's complaint on the grounds that the doctrine of *res judicata* barred Franklin's attempt to relitigate the same issues decided in *Franklin III*. The court began by noting that several allegations in the complaint were taken verbatim from the complaint in *Franklin III*, and that the two complaints were "virtually identical." *Franklin Sav. Corp. v. United States (In re Franklin Sav. Corp.)*, 2002 Bankr.LEXIS 1583 at *6. The court then applied the Tenth Circuit's three-part test for *res judicata* which requires: (1) a final judgment on the merits in the previous suit, (2) identity or privity of the parties, and (3) identity of the claim in both suits. *Mitchell v. City of Moore*, 218 F.3d 1190, 1202 (10th Cir.2000) (citing *Clark v. Haas Group, Inc.*, 953 F.2d 1235, 1238 (10th Cir.1992), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 58 (1992)).

Under the first part of the test, Franklin argued that because the district court in *Franklin III* found it lacked subject matter jurisdiction over the claim due to the discretionary function exception to the FTCA, it never decided Franklin's claims on their merits. *Franklin Sav. Corp. v. United States (In re Franklin Sav. Corp.)*, 2002 Bankr.LEXIS 1583 at 11. The court, however, held that the *Franklin III* court did in fact reach the merits of the claims because, in proceedings under Rule 12(b)(1) of the Federal Rules of Civil Procedure, courts are required to proceed in a summary judgment posture under Rule 56 if the jurisdictional question is intertwined with the merits of the case. *See Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir.1995). Since the *Franklin III* court had in fact treated the motion as one for summary judgment, it necessarily reached the merits of the case, and consequently satisfied the first part of the *res judicata* test. *Franklin Sav. Corp. v. United States (In re Franklin Sav. Corp.)*, 2002 Bankr.LEXIS 1583 at *11.

The court quickly disposed of the second part of the test—identity or privity of parties—since it was uncontested that Franklin was again suing the United States for the actions of the RTC.

Moving to the third part of the test—identity of causes of action—the court picked apart Franklin's complaint in *Franklin III* and compared it to the pending complaint, finding that "Counts I through III of the complaint at issue in this case are identical, word for word, to Counts I through III in the second amended complaint of *Franklin III*." *Franklin Sav. Corp. v. United States (In re Franklin Sav. Corp.)*, 2002 Bankr.LEXIS 1583 at *14–15. Moreover, the new causes of action presented to the bankruptcy court, although not verbatim identical to those seen previously, were merely more descriptive derivatives of count I in *Franklin III*. *Id.*, 2002 Bankr.LEXIS 1583 at *15–16. As a result, the court found that all three parts of the *res judicata* test were satisfied, and therefore Franklin's complaint was dismissed. *Id.*, 2002 Bankr.LEXIS 1583 at *27.

On a policy level, the bankruptcy court also made clear that Franklin could not side-step the doctrine of sovereign immunity and the FTCA by dressing its claims up in the garb of the bankruptcy code when those claims, in truth, sounded in tort. Although section 106[13] of the bankruptcy code permitted adverse claims against the government, Franklin's use of section 106 as an alternative route to recovery would be contrary to Congress' intent that the FTCA be the exclusive remedial route for tort actions against the United States:

> Under plaintiff's conception of how § 106 functions, there would be concurrent yet substantially different methods for suing the United States for money damages for causes of action sounding in tort: 1) the FTCA, for claims brought in district court, with all the prerequisites and limitations applied in full, and 2) § 106 tort claims with none of the FTCA's limitations and requirements. Such a result undermines Congress' intention ... to make the FTCA

the *exclusive* means by which the United States is subjected to liability for claims sounding in tort.

*Franklin Sav. Corp. v. United States (In re Franklin Sav. Corp.)*, 2002 Bankr.LEXIS 1583 at *26 (emphasis original) (citations omitted).

### E. *Franklin's Takings Claim*

Franklin's takings claim has a long and tortured past which is necessary to recount since it provided the initial basis for this court's jurisdiction over Franklin's now pending claims for breach of contract and breach of fiduciary duty. It began in 1991 (before both *Franklin II* and *III*) when Franklin filed for bankruptcy under Chapter 11. During the course of the Chapter 11 proceedings, the government filed a claim in the bankruptcy court alleging that Franklin owed the government nearly $300 million for failing to maintain an adequate net worth as required under applicable rules and regulations, as well as for the costs incurred during the conservatorship. Franklin filed an objection to these claims ("objection claim") along with a counter-claim for compensation under the Takings Clause of the Fifth Amendment.

Both the objection claim and the takings claim were then transferred to the Kansas District Court, where the government filed a motion to dismiss arguing that the U.S. Court of Federal Claims has exclusive jurisdiction over takings claims above $10,000. *See* 28 U.S.C. § 1491 (2000). The district court refused to dismiss the claim, deciding instead to bifurcate the two claims and transfer only the takings claim to this court. After fruitlessly appealing the transfer order, Franklin filed a "second amended counter-claim complaint" (hereinafter "complaint") in this court which included the takings claim (Count I) and a breach of contract claim (Count II).[14]

---

**13.** 11 U.S.C. § 106(b) reads: "[a] governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose." 11 U.S.C. § 106(b) (2000).

This waiver of sovereign immunity is limited to certain circumstances specified in section 106(a),

and does not itself create a claim or substantive claim for relief. *See* 11 U.S.C. § 106(a)(5) (2000).

**14.** The record is unclear as to whether the breach of contract claim was included with Franklin's objection claim and counter-claim in the bankruptcy court. This government concedes it was and this court presumes that it was. Nonetheless, whether it was or was not is not

By this point, the averments in the complaint were somewhat old hat. The facts in the complaint, like those in *Franklin II*, were taken largely verbatim from Franklin's complaint in *Franklin I.* This time around, however, Franklin recast the issues in *Franklin I* using takings vernacular. Franklin simply alleged that the Director's findings that Franklin met FIRREA's statutory grounds for appointing a conservator constituted a taking:

...the reasonable investment-backed expectation of Franklin ... was that if the OTS imposed a conservatorship because it falsely established that Franklin did not meet regulatory capital and other regulatory requirements, Franklin would be justly compensated for that taking.... [I]n "truth and fact" there existed no reasonable basis, much less an expectation of Franklin, of a taking through the appointment of a conservator or receiver since, in truth and in fact:

a. Franklin was not in an unsafe or unsound condition to transact business.

b. Franklin had not incurred, nor was it likely to incur, losses that would deplete all or substantially all of its capital...

c. Franklin had not violated any law or regulation, nor had it committed or engaged in any unsafe or unsound practice or condition which was likely to cause insolvency or substantial dissipation of its assets or earnings, nor likely to weaken Franklin's condition or otherwise seriously prejudice the interests of its depositors...

Compl. at 14.

As for the breach of contract claim, Franklin alleged that it entered a contract with the Federal Savings and Loan Insurance Corporation (FSLIC), the predecessor in interest to the Federal Deposit Insurance Corporation (FDIC), in order to obtain deposit insurance. Implicit in this contract, it was argued, is the covenant of good faith and fair dealing which the government violated when it imposed the conservatorship. The relevant portions of the complaint state:

Long before the events set forth in this Complaint, FSA entered into a contract

critical to the outcome of the claims before this

with FSLIC in order to obtain deposit insurance. Inherent in the contractual relationship between FSA and the United States by and through its instrumentality, FSLIC, are the duties of good faith and fair dealing that generally exist in accordance with the law of contracts.... The reversal of the government's position regarding the operations and management of FSA ... constitutes a violation of the terms of the contractual relationship between the parties... [and] falls far short of satisfying the contractual obligations of good faith and fair dealing.

Compl. at 22.

The government filed a motion to dismiss both claims on April 12, 1999, which was granted as to the takings claim, but denied as to the breach of contract claim. *Franklin Sav. Corp. & Franklin Sav. Ass'n v. United States*, 46 Fed.Cl. 533 (2000). As to the takings claim, this court, in part, held that the Federal Circuit has never upheld a claim that a seizure of a financial institution under the statutes and regulations designed to insure safe and secure banking institutions constituted a taking. *Id.* at 535 (citing *Branch v. United States*, 69 F.3d 1571, 1575 (Fed.Cir.), *cert. denied*, 519 U.S. 810, 117 S.Ct. 55, 136 L.Ed.2d 18 (1996); *Golden Pac. Bankcorp v. United States*, 15 F.3d 1066, 1073–74 (Fed.Cir.), *cert. denied*, 513 U.S. 961, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994); *California Housing Secur., Inc. v. United States*, 959 F.2d 955, 958 (Fed.Cir.), *cert. denied*, 506 U.S. 916, 113 S.Ct. 324, 121 L.Ed.2d 244 (1992)). In addition, to the extent that Franklin alleges the appointment of the conservator was made in bad faith, those claims were ones sounding in tort over which this court has no jurisdiction (even assuming those claims could be relitigated after *Franklin III* ). *Franklin Sav. Ass'n*, 46 Fed.Cl. at 536. As for the breach of contract claim, this court held that dismissal of the claim would be premature since the contract at issue was not yet a part of the record and the court had not had the opportunity to examine its terms.

Following this court's decision to dismiss the takings claim, Franklin amended its com-

court.

plaint to include a third claim for breach of fiduciary duty (Count III) under the Supreme Court's holding in *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Franklin argued that the trust relationship between the United States and the Native Americans was analogous to the relationship between the United States and S & L's because the government assumed elaborate control over the banking industry generally and Franklin specifically. This trust relationship allegedly gave rise to a judicially enforceable fiduciary duty on the part of the government to use reasonable care in handling Franklin's finances—a duty which was breached when the receiver liquidated Franklin's assets. The relevant portions of the complaint are excerpted below:

> The banking statutes in general and those governing conservatorship of financial institutions in particular represent nothing less than a pervasive scheme of federal regulation which would "establish the comprehensive responsibilities of the federal government in managing" the institution. *United States v. Mitchell*, 463 U.S. 206, 222, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).... As a result, "a fiduciary relationship necessarily arises when the Government assumes such elaborate control" over the assets of a third party. *Id.* at 225, 103 S.Ct. 2961. Certainly, "such elaborate control" of FSA occurred at the time that the government imposed a conservatorship.... Defendants completely failed to discharge their fiduciary duties to conserve Franklin and preserve the value of its business.

Compl. at 24–25.

### F. *The Current Motion for Summary Judgment*

On July 31, 2000, the government filed a motion for summary judgment on both the breach of contract and breach of fiduciary

duty claims under Court of Federal Claims Rule 56. The government asserted several bases for its motion, the primary being that allowing Franklin to proceed under a contractual or fiduciary theory would allow it to circumvent Congress' intended route of relief for a seized S & L laid out in FIRREA.[15] Def.'s Mot. for Summ. J. at 11–12. Through this circumvention, other plaintiffs in Franklin's position would enjoy two chances to challenge the Director's actions under different standards of review depending on where and under what theory they asserted their claims. Seized S & L's would receive arbitrary and capricious review under FIRREA in a district court, and *de novo* review under a contract theory in this court. This, the government contended, was irrational, violative of the principles of *res judicata*, and contrary to Congress' intent in establishing both an exclusive pervasive scheme and selective remedies for the highly regulated banking industry. *Id.*

In the alternative, the government argued that Franklin's application for deposit insurance was not a contract. Its terms were not contractually binding on the government, and merely indicated that Franklin was willing to submit itself to government regulation. *Id.* at 14–15. Moreover the government contended that even assuming there was a contract, it was not breached since nothing in its terms required the government to regulate Franklin according to GAAP. *Id.* at 17–18.

As for the breach of fiduciary duty claim, the government first argued that the claim was one sounding in tort over which this court does not have jurisdiction under the Tucker Act. *Id.; and see* 28 U.S.C. § 1491 (2000) (granting this court jurisdiction over cases against the government "not sounding in tort"). Secondly, the government argued that section 1500 of the Tucker Act[16] barred

---

**15.** It should be noted that the government in its motion for summary judgment also argued that FSC and its subsidiary Franklin Savings Association, did not have standing to bring this suit. This court partially rejected that claim, and held that only FSC had standing since it stood to recover any remaining value after Franklin Savings Association's assets were liquidated. Entry of judgment on this standing issue, however, was withheld until a final judgment was entered on

the current motion for summary judgment. *See Franklin Savings Corp. v. United States*, 2002 WL 31950046 (2002).

**16.** Section 1500 reads: "the United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the claim

Franklin's claims because Franklin's claims in the bankruptcy court described above, were already pending when the breach of fiduciary duty claim was added to the complaint. Def.'s Mot. for Summ. J. at 27. Thirdly, the government argued that Franklin previously litigated the same tort claim, albeit under the FTCA, in *Franklin III* and thus *res judicata* barred reasserting the same claim here. *Id.* at 26. Finally, the government argued that the trust relationship found in *Mitchell* was unique to Native Americans and could not be applied in the banking context. *Id.* at 29–30.[17]

In response, Franklin filed a brief in opposition to the motion, and cross-moved for summary judgment on Count II for breach of contract. At the outset, Franklin addressed the government's *res judicata* arguments by attempting to distinguish *Franklin I* and *II*. The Tenth Circuit's review in *Franklin I*, Franklin argued, was a limited one which focused "*solely* on the narrow administrative record submitted by the OTS to the Director, not on the *actual* facts concerning FS[C]'s condition." Pl.'s Mot. in Opp'n and Cross Mot. for Summ. J. at 4 (emphasis original). Likewise, Franklin argued that the Tenth Circuit in *Franklin II* never reached the merits of its claims because it held there was no jurisdiction to challenge the Director's decision to replace the conservator with a receiver. *Id.* As a result, Franklin argued that because the Tenth Circuit never made any determination in *Franklin I* or *II* based on "direct proof," the prior decisions "[did] not treat, much less dispose of, the claims of Franklin arising out of the seizure." *Id.* at 5.

In addition, Franklin argued that *Franklin I* and *II* did not involve the same claims as those raised before this Court. In Franklin's view, the prior litigation merely affirmed the power of the government to seize Franklin, and that notwithstanding that power, Franklin was still free to assert a breach of contract claim. *Id.* This conclusion, it was argued, was bolstered by the Tenth Circuit's statement in *Franklin II*, quoted above, to the effect that Franklin's due process rights were not violated since it was free to pursue action based on the same facts under the FTCA, the APA or the Tucker Act. *Id.* at 5–6.

Franklin thereafter argues that the application for deposit insurance indeed created a contract because it contained the necessary elements of a contract at common law: an offer, an acceptance, and consideration. The offer, it was argued, was manifested by Franklin's filing of the application for deposit insurance with the FSLIC, and the acceptance occurred when the government approved the application and issued a Certificate of Insurance. *Id.* at 7. Consideration, the argument went, was clear because the heading to paragraphs one through twelve of the application included the words "in consideration." *Id.* at 8. Furthermore, underneath that heading, the numbered paragraphs exhibited consideration because, it was asserted, they obligated Franklin to "pay premium charges for insurance as provided under Title IV of the National Housing Act, as amended," and "comply with all valid rules and regulations made by Federal Savings and Loan Insurance Corporation for the insurance accounts and as the same may be from time to time amended." *Id.* Consideration was also exhibited, Franklin alleged, in the Certificate of Insurance which stated that Franklin could represent itself to depositors as an insured institution so long as it complied with Title IV of the National Housing Act. *Id.* at 9.

Having purportedly proved a valid contract, Franklin then argued that breach of the contract would be established according to the following hypothesis:

> The terms of the contract required the government to allow FSA to continue to offer deposit insurance "so long as" FSA complied with all rules and regulations of

---

alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States."

**17.** The government asserted an additional argument that when the FDIC acts, as it did here, in its corporate capacity, it cannot be considered "the government" for purposes of litigation and therefore could not be sued in this court. Resolution of this issue, however, is unnecessary since the court finds against Franklin on other grounds.

the FSLIC and its successors for insurance of accounts. Yet after seizing FSA, the government destroyed FSA's business and *terminated* FSA's ability to offer deposit insurance. The only issues, therefore, is whether that termination of insurance constituted a breach of contract because, at the time of seizure, FSA *was* in full compliance with all applicable rules and regulations.

*Id.* at 15 (emphasis original). Since, to Franklin, the only issue was whether it was complying with the applicable rules and regulations when it was seized, Franklin argued that this court should look at two sources of evidence which created a material issue of fact as to whether it was in compliance: first, an affidavit by Mr. Ernest Fleischer, Chairman of Franklin, stating that Franklin was indeed in compliance; and second, to the reversed and vacated district court opinion in *Franklin I.*[18]

As for the breach of fiduciary duty claim, Franklin reiterated its argument that *res judicata* did not apply to its *Mitchell* claim because the claim differed from its predecessors which were based on state law, or on the bankruptcy code rather than on *Mitchell* itself. Furthermore, Franklin argued that *res judicata* is inappropriate to apply because Franklin was not given a "full and fair opportunity to litigate." *Id.* at 24. Franklin's brief fails to state why it did not have a full and fair opportunity to litigate. Nevertheless, during oral argument counsel explained the rationale: "the standard of proof" for a *Mitchell*-based claim was different than that under the FTCA claim decided by the Tenth Circuit in *Franklin III*. Franklin correspondingly contends that because the *Franklin III* court dismissed for lack of subject matter jurisdiction based on the discretionary function exception to the FTCA, the court did not reach the merits of Franklin's claims and therefore any holdings in *Franklin III* cannot be given preclusive effect.

Franklin also maintained that the holding in *Mitchell* applied beyond the Indian law context. As support, Franklin states that nothing in the Supreme Court's opinion limits it to such a context, and then cites three lower court cases allegedly supporting the idea: *Gollehon Farming v. United States,* 207 F.3d 1373 (2000), *Koshian v. United States,* 1990 WL 201584 (W.D.N.Y.1990), and *Juda v. United States,* 6 Cl.Ct. 441 (1984). Franklin furthermore countered the government's argument that section 1500 of the Tucker Act barred the fiduciary duty claim by arguing that under Court of Federal Claims Rule 15(c) the claim "related back" to 1998—two years before the bankruptcy case was filed—when Franklin originally filed it's complaint in this court.

Oral argument on the summary judgment motion was held on January 13, 2003, and this court has reviewed all pleadings, briefs and filings before this court, the Kansas District Court, the bankruptcy court, and the Tenth Circuit Court of Appeals.

## II. Discussion

### A. *Applicable Standards*

Because the claims before the court implicate subject matter jurisdiction, it is worthwhile to accentuate the standards contained in this court's jurisdictional enabling statute—the Tucker Act. Under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), the Court of Federal Claims is authorized to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. 28 U.S.C. § 1491(a)(1) (2000). This jurisdiction extends only to claims for money damages and must be strictly construed. *United States v. Testan,* 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Moreover, while confer-

18. Apparently predicting this court's reluctance to consider a reversed and vacated opinion, Franklin later makes the bold declaration that "the Tenth Circuit did not, and could not, vacate the *facts*. The facts found by the Kansas District Court in 1990 remain just as true today..." Pl.'s Mot. in Opp'n and Cross Mot. for Summ. J. at 17

(emphasis original). It does not take a prophet, however, to divine that a court would not, and could not, consider the contents of a vacated opinion. Of course, in an epistemological sense, no court can vacate reality. But this court deals in law, not in metaphysics.

ring jurisdiction, the Tucker Act does not create a substantive right enforceable against the United States for monetary damages. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *Testan,* 424 U.S. at 398, 96 S.Ct. 948. "Instead, to invoke jurisdiction under the Tucker Act, a plaintiff must identify a contractual relationship, constitutional provision, statute, or regulation that provides a substantive right to money damages." *Khan v. United States,* 201 F.3d 1375, 1377 (Fed.Cir.2000). This is the burden that Franklin must bear.

Facing the court are the parties' cross-motions for summary judgment. Summary judgment must meet the standards of Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). This rule allows for the court to render summary judgment in a case when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987).

An issue is genuine only if it might prompt a reasonable jury to resolve a factual matter in favor of the nonmoving party. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis original). "If the evidence [of the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–250, 106 S.Ct. 2505 (citations omitted). Furthermore, when deciding a motion for summary judgment, the judge must determine whether the evidence presents a disagreement sufficient to require a submission to a fact finder, or whether the issues presented.are so one-sided that one party must

prevail as a matter of law. *Id.* at 250–52, 106 S.Ct. 2505 (1986); *See also Dart Advantage Warehousing, Inc. v. United States,* 52 Fed. Cl. 694, 697 (2002). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

Also before this court is Franklin's motion to reconsider the dismissal of its takings claim. Motions for reconsideration are governed by Rule 59 and are addressed to the court's discretion. *See Yuba Natural Resources, Inc. v. United States,* 904 F.2d 1577, 1583 (Fed.Cir.1990); *see also Fru-Con Constr. Co. v. United States,* 44 Fed.Cl. 298, 300 (1999), *aff'd,* 250 F.3d 762, 2000 WL 973619 (Fed.Cir.2000); *Seldovia Native,* 36 Fed.Cl. at 594. A party must support the motion by a showing of extraordinary circumstances which justify relief. *See Fru-Con Constr. Co,* 44 Fed.Cl. at 300, *aff'd,* 250 F.3d 762, 2000 WL 973619 (Fed.Cir.2000) (citing *Bally Export Corp. v. Balicar, Ltd.,* 804 F.2d 398, 400 (7th Cir.1986)). This showing, under RCFC 59, must be based "upon manifest error of law, or mistake of fact, and is not intended to give an unhappy litigant an additional chance to sway the court." *Bishop v. United States,* 26 Cl.Ct. 281, 286 (1992) (internal quotation omitted).

To sustain its burden, the movant must show: (1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice. *See Fru-Con Constr. Co.,* 44 Fed.Cl. at 301 (1999); *Bishop,* 26 Cl.Ct. at 286. This is a very difficult test to pass.

**B.  *Count II***

As discussed more fully above, in Count II of Franklin's complaint, it is alleged that Franklin contracted with the government when it applied for federal deposit insurance and that the covenant of good faith and fair dealing implied in that contract was breached when the Director appointed the conservator to operate the affairs of FSA. This court finds that the doctrine of *collateral estoppel* bars a determination of this count because its facts and issues were already adjudicated.

In addition, to the extent *collateral estoppel* does not bar Count II, this court rejects Franklin's argument *in toto* that a contract existed between the government and Franklin and was breached by the Director by failing to apply GAAP standards and by appointing a conservator.

### 1. *Collateral Estoppel*

■ The doctrine of *collateral estoppel*, or issue preclusion, dictates "when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or different claim." RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982).

The doctrine differs from the doctrine of *res judicata*, or claim preclusion, in that *res judicata* serves to bar reassertion of the same claim, whereas the more narrow *collateral estoppel* serves to bar reassertion of specific issues within different claims. *See Parklane Hosiery Co., v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (holding that under the doctrine of *collateral estoppel*, an issue previously decided may be precluded even when the two proceedings were based on different claims.). Thus, under the doctrine of *res judicata*, *Franklin I* prohibits Franklin from reasserting an identical claim under section 1464(d)(2)(E) of FIRREA in another court. The preclusive breadth of *collateral estoppel*, however, is more narrow than *res judicata* in that it applies to judicial resolution of specific factual issues or elements within different claims. As a result, a finding by one court that Franklin operated in interstate commerce in a federal antitrust suit, for example, would be conclusive if Franklin later contested that issue in a federal securities fraud case. *See generally C. Wright, A. Miller & E. Cooper* § 4413–4426 (2002).

The policy underlying the doctrine of *collateral estoppel* is that "to preclude parties from contesting matters they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153–154, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *see also Parklane Hosiery Co.*, 439 U.S. at 326, 99 S.Ct. 645, (holding that purpose of collateral estoppel is to promote judicial economy).

■ The Federal Circuit has developed a four-part test for *collateral estoppel* which requires: (1) the issues are identical to those in the prior proceeding, (2) the issues were actually litigated, (3) the determination of the issues was necessary to the resulting judgment, and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues. *Banner v. United States*, 238 F.3d 1348 (Fed.Cir.2001); *Jet Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1365–1366 (Fed.Cir.2000); *Charter Fed. Sav. Bank v. United States*, 54 Fed.Cl. 120, 126 (2002). *Collateral estoppel* applies equally to findings of fact and conclusions of law. *Arizona v. California*, 530 U.S. 392, 414–415, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000); *Baker v. General Motors Corp.*, 522 U.S. 222, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998).

### a. *Identity of issues*

■ Applying the first part of the test—identity of issues—the question is whether the Tenth Circuit's determination in *Franklin I* that the Director did not act arbitrarily and capriciously in appointing the conservator is the same issue for the purposes of *collateral estoppel* as whether the Director acted in good faith under the contract. The court finds that it is.

Section 27 of the Restatement (Second) of Judgments employs several factors to be addressed in determining whether two issues are identical. These are: (1) whether there is a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first; (2) whether pretrial preparation and discovery related to the matter presented in the first action could reasonably be expected to have embraced the matter sought to be presented in the second; and (3) whether the claims involved in the two proceedings are

closely related. RESTATEMENT (SECOND) OF JUDGMENTS § 27, comment c (1982).

All three of these factors, particularly the third, suggest that Franklin is relitigating the same issue. First, it is clear there is a substantial evidentiary overlap between the claim in the Tenth Circuit and that asserted here. Franklin would presumably use much of the same evidence as that included in the administrative record since that evidence would provide the basis for showing that the Director's rejection of the Hedge Correlation Methodology was without foundation. To the extent Franklin seeks to introduce evidence beyond the administrative record, the Restatement requires only an overlap rather than an exact identity of evidence.

Second, it can reasonably be expected that Franklin's allegation in the first action that the Director acted arbitrarily and capriciously could embrace the latter issue of good faith and fair dealing since conduct either so flagrant or obvious as to constitute arbitrary and capricious behavior would undoubtedly have run afoul of any contractual obligations, assuming they existed at the time. To be sure, agency action that is arbitrary and capricious may or may not constitute bad faith. For example, a lack of substantial evidence on the record justifying agency action could very well constitute arbitrary and capricious conduct,[19] yet may be the result of innocence or even a carelessness, hypothetically not amounting to bad faith. But in the case at bar, looking at the facts of this case, the behavior complained of satisfies both an arbitrary and capricious standard and bad faith conduct. Simply put, in this case both are the exact same thing.

As for the third factor, the similarity of the claim asserted in *Franklin I* and the claim

asserted here is made apparent when the complaints from the two proceedings are juxtaposed. The facts alleged in the complaint at bar are virtually word-for-word identical to those in Count IV of the complaint in *Franklin I*. There are nearly ten pages of verbatim text taken from the *Franklin I* complaint which are reasserted in the complaint before this court. Also plainly demonstrating that the same facts are at issue, the reversed and vacated opinion of the district court in *Franklin I* is cited in Franklin's complaint at bar not only for its favorable factual findings, but four times for the conclusion that "in truth and in fact" Franklin was not in "an unsafe and unsound business condition." [20]

Two very important examples of specific identical allegations demonstrate this point. In the *Franklin I* complaint it is avowed that the Director's decision that Franklin's Hedge Correlation Analysis Methodology failed to comply with GAAP "was nothing more than an attempt to create some basis for their predetermined takeover of Franklin." *Franklin I* Compl. at 4. Later in the *Franklin I* complaint when Franklin describes more specifically how the Director acted arbitrarily and in bad faith, it is stated that: "OTS acted intentionally and recklessly... without regard for potential damage and embarrassment to Franklin in the financial community which evidences that OTS was not motivated by legitimate regulatory concerns." *Franklin I* Compl. at 13. These two contentions are reasserted virtually verbatim in the complaint filed in this court. Compl. at 8–10.

A further example of the close relationship in claims appears in Count IV of the *Frank-*

---

19. *See Consumers Union of United States v. Federal Trade Commission*, 801 F.2d 417, 422 (D.C.Cir.1986) (Scalia, J., noting that substantial evidence and arbitrary and capricious standards are "one and the same").

20. Franklin cited the district court's opinion in *Franklin I* this way: *"Franklin Savings Ass'n v. OTS*, 742 F.Supp. 1089 (D.Kan.1990) *rev'd on scope and standard of review*, 934 F.2d 1127 (10th Cir.1991)." One would search the Harvard Uniform System of Citations Handbook, commonly referred to as the "Blue Book," in vain to find the *"rev'd on scope and standard of*

*review"* explanatory phrase. This is plainly an endeavor by Franklin to either mask or "spin" the fact that the district court's opinion was not only reversed but was vacated—ergo, it has no legal value, no precedential value, and, in the eyes of law, does not exist. It is a nullity. *See* 2A Federal Procedure L.Ed. § 3:870 (2003) (citing *United States v. Montgomery County Bd. of Educ.*, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969)). This is not simply attempted legerdemain on the part of Franklin. This is near deceit.

*lin I* complaint where Franklin asserted that it was "arbitrary and capricious, and an abuse of discretion for the defendants to change their views on specific applications of GAAP accounting." *Franklin I* Compl. at 34. In Count II of the complaint before this court, Franklin alleges that "the reversal of the government's position regarding the operations and management of FSA ... falls far short of satisfying the contractual obligations of good faith and fair dealing." Compl. at 22.

This conclusion is again clearly demonstrated later in Count II of the present complaint when Franklin contends that "[t]he allegation of the OTS that FSA was 'unsafe and unsound' and all other allegations comprising the alleged basis for seizure of FSA and imposition of a conservatorship represented an abrupt, unjustified, and factually unsubstantiated change in position by the OTS." *Id.* This, of course, is simply another way to argue that OTS acted arbitrarily.

Thus, the allegations in the complaint before this court are simply the same assertions made in *Franklin I*, but are cast more broadly and under the guise of contract law. At base, the allegations center around the Director's alleged bad behavior. In *Franklin I*, the Director's behavior in changing his mind on the acceptability of the Hedge Correlation Methodology was alleged to be arbitrary and capricious. Here, the exact same behavior is alleged to have constituted a breach of the covenant of good faith and fair dealing. It is thus plain to the court that the issues in the two cases are identical.

Even assuming, arguendo, that there is not *exact* identity of issues, the policy behind *collateral estoppel* and the Restatement shows issue preclusion is still appropriate in this case. The Restatement articulates that in situations where there is a lack of complete or total identity of issues "the problem involves a balancing of important interests: on the one hand, a desire not to deprive the litigant of an adequate day in court; on the other hand, a desire to prevent repetitious litigation of what is essentially the same dispute." RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c (1982); *See also Jet, Inc.*, 223 F.3d at 1363; *and Young Eng'rs, Inc. v.*

*United States Int'l Trade Comm'n,* 721 F.2d 1305, 1314 (Fed.Cir.1983) (noting that the Federal Circuit is broadly guided by the Restatement). Clearly, after more than ten separate chances to litigate their claims in different fora, Franklin cannot legitimately claim that they have been deprived of their "day in court."

If truth be told, after hours of very careful scrutiny of all of the complaints and pleadings in all of the previous courts, and all of the written decisions, as well as the complaint and voluminous record before this court, the court finds that Franklin is repeatedly litigating essentially the same claim. This is a clear waste of judicial resources, contrary to judicial economy, and thus contrary to the policy behind *collateral estoppel* elicited by the United States Supreme Court in *Parklane Hosiery* and *Montana.* Franklin should normally be free to spend its money the way it wants and on extravagances it wishes. But, it should not have clear license to waste tax payers' money and the resources and time of the judiciary.

b.  *Whether the issues were actually litigated*

The second criterion of the Federal Circuit test for *collateral estoppel* mandates actual litigation of the issues by simply requiring the issue to be "properly raised, by the pleadings or otherwise, and [be] submitted for determination, and [be] determined." *Banner,* 238 F.3d at 1354; *Charter Fed. Sav. Bank,* 54 Fed.Cl. at 126; *See also* RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. d (1982). As stated above, Franklin argues they never actually litigated the good faith issue in *Franklin I* because the Tenth Circuit's opinion only focused on the administrative record, rather than on "direct proof" that Franklin was in compliance with GAAP. Pl.'s Mot. in Opp'n and Cross Mot. for Summ. J. at 4.

However, Franklin's argument misses the point. An opportunity to offer "direct proof" outside of the record goes to another criterion, that of "full and fair opportunity" to raise the issue, which is discussed below. The proper inquiry for the factor of whether the issue was litigated under both the Restate-

ment and the law of the Federal Circuit are: (1) whether Franklin properly raised the issue in its pleadings or otherwise, (2) whether the issue was submitted for determination, and (3) whether it was determined.

Addressing the first question, Franklin indeed raised the issue that the Director acted in bad faith. As shown above, Franklin's complaints at each stage included a claim that the director acted in bad faith and arbitrarily and capriciously. Thus, there is no doubt Franklin raised the issues in its pleadings or otherwise.

Addressing the second element, the issue of the Director's conduct was obviously submitted for determination. In both the district and appellate courts Franklin proffered the counts in its complaints and made the arguments in its written briefs. Oral arguments were held in each action. It can therefore fairly be said that Franklin submitted the issue for determination.

The third and final question—whether the issue was determined—is answered in the Tenth Circuit's *Franklin I* opinion: "our review persuades us that the Director's decision was not arbitrary capricious or an abuse of discretion. The decision was supported by substantial evidence in the record, and is in accordance with the applicable law." The issue was indeed determined.

c. *Whether the determination of the issue was necessary to the resulting judgment*

For issue preclusion to apply, the third element of the Federal Circuit's test must be met: the previously decided issue must be necessary to the resulting judgment. RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. h (1982). Unnecessary determinations of issues have the characteristics of *dicta*, and may not ordinarily be reviewed. *Id.* To be "necessary and essential to the resulting judgment, a determination of finding in a prior action need not be so crucial that without it the judgment could not stand, but must be more than the incidental or collateral determination of a nonessential issue." *Charter Fed. Sav. Bank*, 54 Fed.Cl. at 127 (quoting *Mother's Restaurant, Inc., v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1571 (Fed.Cir.1983)).

In this case it is clear that the Tenth Circuit's holding in *Franklin I* that the Director acted in accordance with statutory law and the applicable standards of administrative law when appointing the conservator was clearly necessary to the resulting judgment. The outcome of that issue was indeed the core of the case since its outcome determined which party prevailed. Conversely, the issue could in no way be considered collateral or nonessential since its determination was necessary to finding liability under FIRREA and the APA. As a result, the court finds the third prong of the test for collateral estoppel met.

d. *Whether Franklin had a full and fair opportunity to litigate*

The fourth and final Federal Circuit requirement for *collateral estoppel* is that the party against whom preclusion is sought have had a full and fair opportunity to litigate. *Banner*, 238 F.3d at 1354; *and Jet, Inc.*, 223 F.3d at 1366; *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 28(5)(C) (1982). In determining whether a party had such an opportunity, a court should consider the following: (1) whether there were significant procedural limitations in the prior proceeding, (2) whether the party had an incentive to litigate fully the issue, and (3) whether effective litigation was limited by the nature or relationship of the parties. *Banner*, 238 F.3d at 1354 (citing *C. Wright, A. Miller & E. Cooper* § 4423 at 601–620 (2002)).

The latter two of these elements can be disposed of out-of-hand. Franklin had a very strong incentive to fully litigate. For one, there were several million of Franklin's dollars riding on the Tenth Circuit's decision to uphold or reverse the Director's decision to appoint a conservator. *See C. Wright, A. Miller & E. Cooper* § 4423 at 612 (2002) (noting that the stakes in the prior litigation may either dissuade or invigorate a party's incentive to litigate provide incentive to fully litigate); *see also Eureka Fed. Sav. and Loan Ass'n v. American Cas. Co.*, 873 F.2d 229, 233–234 (9th Cir.1989); *Rawls v. Daughters of Charity of St. Vincent De Paul*, 491 F.2d 141, 148 (5th Cir.1974). In addition,

Franklin's incentive to litigate can be inferred from the shear number of times it litigated claims. As for the third factor, Franklin's opportunity to litigate was not limited by the nature or relationship of the parties—Franklin was neither a disabled class which required a guardian to litigate, nor did Franklin appear in *propria persona. See Id.* at 618.

Franklin's somewhat better, yet only colorable, argument derives from the first factor, whether there was a significant procedural hurdle in the prior proceeding. Franklin asserted during oral argument that issue preclusion should not apply because the "standard of proof" is different with respect to a Tucker Act claim as compared with the claims previously asserted. Mo. for Summ. J. Tr. at 36. Presumably, counsel is arguing that it was deprived a full and fair opportunity to litigate in *Franklin I* because the limited scope of review (the administrative record) and limited standard of review (arbitrary and capricious) was a significant procedural limitation.

Franklin's claim in this respect perhaps stems from section 85 of the Restatement (Second) of Judgments which lists an exception to the doctrine of *collateral estoppel* where "[t]he party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action..." RESTATEMENT (SECOND) OF JUDGMENTS § 28(4) (1982). The best example of this exception is in the criminal setting where issues decided against the government under the "beyond a reasonable doubt" standard are not thereafter conclusive should the government attempt to relitigate those issues in the civil context under the lesser "preponderance of the evidence" standard. Extrapolating on this point, Wright & Miller in their treatise on federal procedure cite and explain the Supreme Court case of *One Lot Emerald Cut Stones v. United States,* 409 U.S. 232, 235, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972):

> The most prominent Supreme Court ruling was made in [*Cut Stones* ]. Acquittal on charges of smuggling emeralds into the United States with intent to defraud was held not to preclude a civil forfeiture proceeding against the emeralds. Initially, the Court noted that the acquittal may have rested on failure to prove intent to defraud, a matter not even in issue in the forfeiture proceeding. Then it invoked several prior rulings that in any event acquittal in a criminal proceeding represents no more than an adjudication that the proof was not sufficient to overcome all reasonable doubt of guilt. The acquittal is not an adjudication on the preponderance of the evidence standard, and thus cannot preclude the distinct issue whether the required facts can be shown according to that standard.

18 Fed. Prac. & Proc. Juris.2d § 4422 (2002).

There are serious analytical problems presented by Franklin's argument on this point. First, an arbitrary and capricious standard is not a burden of proof. It is a judicial standard of review of an agency *de novo* determination. Indeed, the Tenth Circuit recognized that Franklin need only demonstrate arbitrary and capricious conduct by a preponderance of evidence. *Franklin Sav. Ass'n,* 934 F.2d at 1135–1136 ("The trial court correctly noted this would require Franklin to show by a preponderance of the evidence that the agency's decision ... was arbitrary and capricious..."). Of course, this is the same burden of proof in the case at bar. Furthermore, it is well established that despite a deferential standard of review, judicial affirmance of an agency determination is entitled to preclusive effect. *E.g., CIBA Corp. v. Weinberger,* 412 U.S. 640, 644, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973).

Second, even assuming, arguendo, that an arbitrary and capricious standard equates to a burden of proof or persuasion, Franklin still cannot take advantage of this exception to the *collateral estoppel* doctrine. As noted, the issue of good faith and fair dealing is inextricably linked with the arbitrary and capricious standard in the facts of this case. They are the very same thing. As discussed above, whether or not the Director's conduct demonstrated bad faith for contractual purposes centers on an analysis of whether there were enough cogent and demonstrable facts buttressing his reasons for rejecting the Hedge Correlation Methodology. This com-

plained-of conduct is exactly the same behavior analyzed by the Tenth Circuit when it favorably weighed the Director's actions under the arbitrary and capricious standard. What would be arbitrary and capricious behavior in *Franklin I* would also by definition amount to bad faith in the factual circumstances of this case.

In this respect, the case at bar is unlike *Cut Stones* because the issue of whether the defendant intended to commit fraud was separate and apart from the idea that the defendant's intent to commit such fraud had to be proven beyond a reasonable doubt. Again, here the issue of the Director's bad faith cannot be separated from the arbitrary and capricious standard since Franklin's failure to show that the Director acted arbitrarily and capriciously simultaneously established that Franklin both failed to meet its burden of proof, and also established that the Director did not act in bad faith. Thus, the exception under section 28 of the Restatement of Judgements cannot be squarely applied to this case.

Be that as it may, the overarching question in determining whether Franklin had a full and fair opportunity to litigate is whether Franklin faced a *significant* procedural hurdle when it litigated before the Tenth Circuit Court of Appeals in *Franklin I.* Under Supreme Court precedent, the "full and fair opportunity to litigate" criterion is generally satisfied as long as the procedures in the first action comported with minimum due process requirements under the Fourteenth Amendment. *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *see also* 1 Judgments in Federal Court § 8.05 at 370 (1997). That is, unless it can be said that Franklin was not represented by counsel, unable to cross examine witnesses, forbidden a public hearing, denied a right to appeal, or deprived of necessary facts due to the government's fraudulent concealment of them, it cannot be said that Franklin faced a significant procedural hurdle when it litigated before the Tenth Circuit Court of Appeals. *See Kremer,* 456

U.S. at 483–484, 102 S.Ct. 1883; *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Buckhalter v. Pepsi–Cola General Bottlers, Inc.,* 820 F.2d 892 (7th Cir.1987); *Davis v. Charleston,* 827 F.2d 317 (8th Cir. 1987); *Caldeira v. County of Kauai,* 866 F.2d 1175 (9th Cir.1989). Because Franklin was faced with no such hurdle, it cannot be said they were denied a full and fair opportunity to litigate the relevant issue.

That Franklin was afforded these basic due process protections in the Tenth Circuit also forecloses their argument that they were denied a full and fair opportunity to litigate because they could not offer "direct proof"-i.e., evidence outside the administrative record. Indeed, the Supreme Court in *Kremer* expressly held that "[t]here is no requirement that judicial review must proceed *de novo* if it is to be preclusive." *Kremer,* 456 U.S. at 480, 102 S.Ct. 1883; *see also Kunzelman v. Thompson,* 799 F.2d 1172 (7th Cir. 1986) ("A full evidentiary hearing is not always necessary to provide due process protection or a fair opportunity to litigate the issue"); *Searing v. Hayes,* 684 F.2d 694, 695 (10th Cir.1982) (full and fair opportunity to litigate legality of search met even though plaintiff was denied evidentiary hearing). Furthermore, under the Supreme Court's seminal *Overton Park* decision, the Tenth Circuit, if justice demanded, could have ordered additional findings or taken testimony from agency officials to determine if the Director's action was justified.[21] *See Citizens to Preserve Overton Park, Inc., v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This juridical power further protected Franklin's due process rights, and thus, further bolsters this court's finding that Franklin did not face a significant procedural limitation tantamount to a denial of a full and fair opportunity to litigate.

In sum, it is clear to this court that Franklin is trying every possible means to relitigate its loss in *Franklin I.* The current breach of contract claim is merely Franklin's latest attempt to have another bite at the *Franklin I* apple: it has essentially re-filed

**21.** The *Franklin I* court noted the *Overton Park* holding but refused to apply it. *Franklin Sav.* *Ass'n,* 934 F.2d at 1138.

the same complaint; its pleadings and oral arguments cite the reversed and vacated opinion of the *Franklin I* district court no less than 15 times; and, by Franklin's own admission, the only issue was and is whether "Franklin was in full compliance with the rules and regulations." Pl.'s Mot. in Opp'n and Cross Mot. for Summ. J. at 15. That issue was determined against Franklin by the Director, and the Tenth Circuit Court of Appeals found more than enough evidence in the record to support that determination. To reopen that issue now would run contrary to the doctrine of *collateral estoppel,* defy judicial economy, permit abuse of the system, and result in repetitious litigation. "In our system of jurisprudence the usual rule is that merits of a legal claim once decided in a court of competent jurisdiction are not subject to redetermination in another forum." *Kremer,* 456 U.S. at 485, 102 S.Ct. 1883.

### 2. *The Application for Deposit Insurance does not Constitute a Contract*

Even assuming the doctrine of *collateral estoppel* does not bar Franklin's breach of contract claim, the application for deposit insurance does not constitute a contract. Franklin asserts two arguments for the contrary conclusion, each of which are addressed in turn.

Franklin's first argument, as stated earlier, is that the application for deposit insurance created a binding contract under traditional contract law, and that the terms of that contract were breached by the Director's actions. More specifically, Franklin argues that the application for deposit insurance constituted an offer, and that the government's acceptance of that offer occurred when the application was approved and a "Certificate of Insurance" was issued. Consideration, the argument goes, was present because Franklin promised to pay premiums for the insurance and comply with all valid

rules and regulations made by the Federal Savings and Loan Insurance Corporation.[22] As a result, as long as Franklin paid its premiums and complied with all valid rules and regulations, the government was obligated to provide Franklin with deposit insurance. Thus, to Franklin, as long as its books complied with GAAP (because implicitly either GAAP is a valid rule and regulation or the Director was obligated to apply GAAP [23]) the government was obligated to provide deposit insurance. When the Director refused to assess Franklin's books according to GAAP, the argument concludes, the government breached the contract. This argument is clearly infirm.

■ The general requirements for an express or implied contract under the Tucker Act are: (1) mutuality of intent to contract, (2) consideration, (3) lack of ambiguity in offer and acceptance, and (4) actual authority of the government representative whose conduct is relied upon to bind the government in contract. *Trauma Serv Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997); *Lewis v. United States,* 70 F.3d 597, 600 (Fed.Cir.1995); *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990).

■ There is ambiguity in both the offer and acceptance since neither the offer (the application) nor the acceptance (the approval of that application and the Certificate of Insurance) mentions anything about GAAP. Of course, an offer must specify a promise to perform the terms of an express contract. The terms of the offer must be specific and unambiguous, so that acceptance of that offer will cement a binding bargain enforceable by law. *See Linear Technology Corp. v. Micrel, Inc.,* 275 F.3d 1040, 1051 (Fed.Cir.2001)("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his as-

---

**22.** Franklin also argued that consideration could be inferred because the heading to paragraphs one through twelve of the application used the words "in consideration." The court must reject this argument as one elevating form over substance. *See Cutler–Hammer, Inc. v. United States,* 194 Ct.Cl. 788, 794, 441 F.2d 1179, 1182–1183 (1971) ("In general, the obligation of the government, if it is to be held liable, must be

stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention . . .").

**23.** The latter, of course, was rejected by the Tenth Circuit in *Franklin I* and demonstrates once again that Franklin merely seeks to relitigate claims they lost.

sent to that bargain is invited and will conclude it.") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24 (1981)); *accord* Richard A. Lord, Williston on Contracts § 4:13, at 367 (4th ed.1990) (explaining that "in order for an offer to exist, it must constitute a manifestation communicated to the offeree so as to justify his understanding that by assenting a bargain will be concluded"). The clear problem with Franklin's argument in this respect is that nothing in the application for deposit insurance indicates an intent by the government to apply GAAP to Franklin or that GAAP would constituted the applicable "rules and regulations" governing the application for deposit insurance. The application for deposit insurance, the approval thereof, and the Certificate of Insurance are just what they purport to be—documents dealing with the subject matter of deposit insurance and not those dealing with accounting standards, conservatorships, liquidation, or any other issue implicated in the case *sub judice.*

This also shows no mutuality of intent since nothing in the application for deposit insurance—most importantly, in the clause requiring Franklin to comply with all valid rules and regulations—indicates the government's intent to be bound by GAAP. Clearly, there can be no contract where the meeting of the minds, if any, is so indiscernible and tenuous. *See, e.g., Trauma Serv. Group,* 104 F.3d at 1326 (holding material term in agreement must be explicitly agreed to); *see also Browning v. Peyton,* 918 F.2d 1516, 1521 (11th Cir.1990)(citing *O'Neill v. Corporate Trustees, Inc.,* 376 F.2d 818, 820 (5th Cir. 1967))("there must be a meeting of the minds on all essential terms and obligations of the contract"); *and Big Yank Corp. v. Liberty Mut. Fire Ins.,* 125 F.3d 308, 315 (6th Cir. 1997) ("an enforceable contract is not created unless the offer is accepted and there is actually a meeting of the minds as to the provisions of the alleged agreement").

But Franklin makes one more argument straining to prove the Director erred in appointing a conservator: that somehow, the Director's conduct amounted to a governmental breach of an implied term of its alleged (and the court believes mythical) contract, the covenant of good faith and fair dealing. This contention is also chimerical.

In the context of government contracts, where a plaintiff alleges the government violated the contractual covenant of good faith and fair dealing, there is a strong presumption that the government acted in good faith. *D.V. Gonzalez Elec. & Gen. Contrs. v. United States,* 55 Fed.Cl. 447 (2003) (citing *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977)). This presumption can be surmounted only with a proffer of "well nigh irrefragable proof" of the government's bad faith which requires a showing of the government's specific intent to injure or actual malice on the part of the government toward the plaintiff. *D.V. Gonzalez Elec. & Gen. Contrs.,* 55 Fed.Cl. at 457; *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 198–199, 543 F.2d 1298 (1976). Additionally, the implied obligation "must attach to a specific substantive obligation, mutually assented to by the parties." *Detroit Hous. Corp. v. United States,* 55 Fed.Cl. 410 (2003) (quoting *Alaska v. United States,* 35 Fed.Cl. 685, 704 (1996), *aff'd,* 119 F.3d 16, 1997 WL 382032 (Fed.Cir. 1997), *cert. denied,* 522 U.S. 1108, 118 S.Ct. 1035, 140 L.Ed.2d 102 (1998)).

To the extent Franklin argues that the government violated the covenant of good faith and fair dealing, Franklin fails to show the precise contractual terms to which the covenant attached. *See Alaska v. United States,* 35 Fed.Cl. 685, 704 (1996), *aff'd,* 119 F.3d 16, 1997 WL 382032 (Fed.Cir.1997), *cert. denied,* 522 U.S. 1108, 118 S.Ct. 1035, 140 L.Ed.2d 102 (1998). In *Alaska,* the State of Alaska argued that the legislation granting it statehood in 1959 created a contract between the state and the federal government. Under the contract, it was argued, the federal government agreed to actively manage Alaskan lands and maximize the land's revenue potential through mineral leasing. This contract was breached when the federal government refused to exploit oil in the Arctic National Wildlife Refuge (ANWR).

The specific language which the State of Alaska argued gave rise to a contractual relationship was implied in a portion of the

statehood legislation that amended the Mineral Leasing Act 30 U.S.C. § 187 *et seq.* (1994) (MLA). Prior to the amendment, the MLA allocated 37.5% of all mineral leasing revenue to the State of Alaska. The amendment included in the statehood act increased this amount by 52.5 %, which brought the total revenue percentage to 90. The relevant portions of the pre-amendment text read:

> All money received from sales, bonuses royalties, and rentals of public lands ... shall be paid to the Treasury of the United States; 37½ per centum thereof shall be paid by the Secretary of the Treasury as soon as practicable after December 31 and June 30 of each year to the State or the Territory of Alaska within the boundaries of which the leased lands or deposits are or were located ...

*Alaska,* 35 Fed.Cl. at 692. The amendment, passed in 1957, was inserted after the semi-colon and read "and of those from Alaska, 52½ per centum thereof shall be paid to the [Territory] of Alaska for disposition by the legislature thereof."

The State of Alaska argued that the amendment created a contract under which there was an implied duty of good faith and fair dealing on the part of the government to maximize revenue from the federally held lands. *Id.* at 704. This obligation, Alaska argued, gave rise to an implied duty not to interfere with the State of Alaska's reasonable expectation of return on federal mineral lands. This obligation, the argument went, was violated when the federal government refused to exploit ANWR. *Id.* The court, however, disagreed and held "[t]he implied obligation of good faith and fair dealing must attach to a specific substantive obligation mutually assented to by the parties. In the present case, however, Alaska would have the implied duty of good faith and fair deal-ing create by implication an express obligation to open up specific federal lands to generate additional revenue for the States. There is no such express substantive obligation in [the amendment]." *Id.* at 704–705.

Franklin makes essentially the same mistake as did the State of Alaska. Franklin claims "by seizing FSA, destroying its business and then terminating its right to offer deposit insurance to its customers, even though...FSA remained in full compliance with all applicable deposit insurance rules and regulations, the government destroy[ed] or injur[ed] the right of [Franklin] to receive the fruits of the contract. In doing so, the government violated the implied duty of good faith and fair dealing and thereby breached the contract." Pl.'s Mot. in Opp'n and Cross Mot. for Summ. J. at 21 (citations omitted).

The problem with this argument, is that there is no substantive provision in the contract, mutually assented to by the parties, obligating the government to apply certain rules and regulations—i.e., GAAP. Just as in *Alaska* where there was nothing in the amendment specific to ANWR, there is nothing in the application for deposit insurance which specifies that GAAP would constitute the controlling rules and regulations.[24] Franklin is simply shoe-horning an obligation by the government to apply GAAP into a contract where neither the text nor the intent of the parties supports it. Although the obligation of good faith and fair dealing is a real one, it is not a catch-all for Franklin whereby they can retroactively insert specific obligations into an otherwise silent contract. A holding to the contrary would allow the covenant of good faith and fair dealing to supplant specific terms of the contract. Moreover, it would obviate classic contract law and eliminate any incentive to enter a

---

24. When asked at oral argument for the specific contract term giving rise to the government's obligation to apply GAAP, counsel for Franklin gave the following response:

> it's part of the regulation, and we do have, under the application for insurance, that they wrote back and said was accepted, so we have the application with these commitments and terms, and the it [sic] was accepted, and one of them is that we will comply. They had us agree: "[i]n consideration of granting insur-ance the undersigned agrees, number 12 [referring to clause 12 of the application for deposit insurance], it will comply with all valid rules and regulations made by the Federal Savings and Loan Insurance Corporation, the insurance of accounts, and as the same may be from time to time amended."

Tr. at 50. (quoting the application for deposit insurance). This unresponsive circumlocution bolsters the court's finding that there are no such terms in the application for deposit insurance.

contract in the first place since neither party could be assured that the terms of the contract were final, exclusive and binding.

In addition, were the court to mandate retroactive insertion of obligations via the covenant of good faith and fair dealing, the court would be legislating an independent basis for challenging regulatory actions, perhaps circumventing the specific requirements of a regulatory scheme and certainly bypassing the APA, which Congress established as the primary mechanism to challenge regulations and governmental actions. This *deus ex machina* would operate as follows: (1) plaintiff files an application for deposit insurance or some other governmentally permitting activity, (2) plaintiff agrees under that "contract" to abide by all applicable rules and regulations, (3) plaintiff disagrees with some rule or regulation or how it is being implemented, (4) plaintiff complains to a court that the regulation or its implementation violates the covenant of good faith and fair dealing implicit in the so-called "contract," and (5) a court reviews *de novo* whether the government's regulation or its implementation violates the covenant and thus breaches the contract.

No plaintiff worth their salt would challenge agency action under the more deferential arbitrary and capricious standard when they could alternatively challenge the same conduct under a hypothetically more lenient breach of contract theory. At least it would give litigants another crack at challenging agency actions.

When questioned on this point during oral argument, the following dialogue transpired:

THE COURT: So what you're doing is every time that the Congress of the United States passes a law or amends a regulation or creates a new regulation that becomes part of your contract?

COUNSEL FOR FRANKLIN: It does, and we subjected ourselves to that, and that's part of our...

THE COURT: So the regulatory system becomes a breach of contract, not just a mere regulation?

COUNSEL FOR FRANKLIN: Let me analogize it to a [Fifth Amendment] takings case.... The government has often said, the regulated industry cases, the government says it's a regulated industry and we're just regulating, and every once in awhile a plaintiff comes along and says this is more than regulating and it constitutes a taking. Analogize that to the contract situation where the government says, hey, we're just dealing with our regulations, and they don't like what we're doing, and there is a beef with the regulators about this and that, and so they come running to the Claims Court.

We're not saying that at all. We're saying that this went beyond dealing with their regulations. We understand that they can deal with us under their regulations as they want, but when they step out, and they say we are not going to follow that regulation in determining the numbers that count for you; we're going to use this different theory ... now that steps beyond the pale of regulation. For example, they had the power to regulate us under GAAP, but how in the world does a regulator step away from GAAP, step away from the rules, step away from what we agreed to comply with, and then say that's regulated? So what I would say in our contract claim, our contract claim is a regulation, is a breach of contract.

Tr. at 51–53.

There are several significant problems with counsel's answer. First and foremost, counsel's answer reiterates and clearly demonstrates that what Franklin really wants is another chance to challenge the validity of the applicable banking regulations and overturn the Director's decision. *Franklin I* forecloses such a chance.

Second, and more to the point, it is clear that Franklin is employing exactly the contrived artifice described above to try to bypass the APA: (1) Franklin filed an application for deposit insurance; (2) Franklin agreed under clause 12 of that application to abide by all applicable rules and regulations; (3) Franklin is now disagreeing with the implementation of a regulation ("we're not going to follow that regulation in determining the numbers that count for you"); (4) they now challenge it in this court under a breach

of contract theory ("our contract claim is a regulation, is a breach of contract"); and (5) Franklin hopes by getting beyond summary judgment they will get another *de novo* shot at reversing the Director's decision as to the business solvency and soundness of FSA ("Judge Saffles [the district court judge in *Franklin I* ] tells you in advance what you might see if we are permitted to have a full and fair opportunity to litigate").[25] Considering the complexity and pervasiveness of the banking industry and its concomitant regulatory structure, such bypass is plainly contrary to Congress' intended scheme.[26]

Third, plaintiffs' circumvention scheme would contravene this court's jurisdictional mandate under the Tucker Act by allowing plaintiffs such as Franklin to challenge regulations which are not money mandating. As interpreted by the Supreme Court, the Tucker Act is strictly jurisdictional and does not establish a substantive right to recovery. *Mitchell*, 445 U.S. at 538, 100 S.Ct. 1349; *Testan*, 424 U.S. at 398, 96 S.Ct. 948. As a result, plaintiffs must identify a contractual relationship, constitutional provision, statute or regulation that mandates payment of money for its breach. *Id., and see Worthington v. United States*, 168 F.3d 24, 26 (Fed.Cir. 1999). Here, although the deposit insurance "contract" is plaintiffs asserted substantive right to recovery, it is clear from the discussion *supra* that the contract is merely serving as a conduit through which plaintiffs can re-challenge the Director's decisions made pursuant to section 1464 of FIRREA. By itself, section 1464 is not money mandating. Thus, to allow plaintiffs to challenge it under a contrived breach of contract theory would obviate the requirement of *Testan* and *Mitchell* that there be a money mandating source of recovery. *See Baker v. United States*, 50 Fed.Cl. 483, 489 (2001) ("The rule from *Testan*—that jurisdiction under the Tucker Act cannot be premised on the asserted violation of regulation that specifically do not authorize awards of money damages—

cannot be avoided simply by characterizing the applicable statute or regulation as creating an implied contract"); *and see Lion Raisins, Inc. v. United States*, 54 Fed.Cl. 427, 432 (2002) (dismissing plaintiff's claim that agriculture regulation created an implied-in-fact contract because the regulation could not be characterized as a contract and was not money mandating).

Fourth, Congress' intent in passing FIR-REA to prohibit judicial second guessing of the Director's decision to appoint a conservator weighs strongly against permitting Franklin to litigate its claim in this court. Both *Franklin I* and *II* visited the issue in depth and both concluded that the Director's actions vis-a-vis conservators and receivers was intended to be shielded from judicial review. The *Franklin I* court made clear at the outset that FIRREA was intended to resolve the S & L crisis that threatened to cost taxpayers and depositors millions of dollars. *Franklin Sav. Ass'n v. United States*, 934 F.2d 1127, 1136 (10th Cir.1991). To achieve that goal, Congress gave the OTS and the Director substantial supervisory and oversight power, including the ability to appoint a conservator or receiver when the Director was of the opinion that an S & L was about to go under. *Id.* This power was intended to be exercised quickly and vigilantly without the interference of the courts, except in the rare circumstance that the Director acted arbitrarily, capriciously, and in bad faith. *Franklin Sav. Ass'n*, 934 F.2d at 1137. Nowhere is it clearer that Congress sought to limit the courts' role than in section 1464(d)(2)(D) which reads: "no court may take any action for or toward the removal of any conservator or receiver or, except at the request of the Director, to restrain or affect the exercise of power or functions of a conservator or receiver." 12 U.S.C. § 1464(d)(2)(D) (2000). Thus, it is clear that Congress, by limiting judicial review of the Director's decisions, intended to prevent exactly what Franklin is trying to do—obtain

---

25. Tr. at 41.

26. Franklin is also undermining the notion of Regulatory Accounting Principles (RAP), which are accounting principles not sanctioned under GAAP, but which are used by the government in

regulatory schemes such as FIRREA to achieve policy objectives, such as helping a thrift build up its capital base. *See A Guide to the Federal Home Loan Bank System*, Federal Home Loan Bank System Publication Corp. (1987) at 69.

repeated and probing judicial reviews of the Director's decisions until they win. This is simply contrary to the law.

In light of these insurmountable hurdles, this court declines to follow Franklin's advice to use the precepts of contract law to generate a gaping loophole in the regulatory banking system of this country by doing what, in essence, amounts to legislating an alternative to the review mechanisms contained in both FIRREA and the APA. Such a use would be a misuse. It would execute a partial repeal of these statutes by judicial fiat.

## C. *Count III*

■ In Count III of Franklin's complaint it is alleged that the Supreme Court's decision in *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct.. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II* ) imposed a fiduciary duty on the government at the time Franklin was seized. This so-called *"Mitchell* trust" was allegedly breached by the defendant's failure to "conserve FSA and preserve the value of its business." Compl. at 25. Although Franklin's argument on this count was briefly described above, to decide this issue it is necessary to describe more fully Franklin's complaint and certain of its related arguments.

Similar to the strained logic of the allegations contained in Count II, Franklin's argument in Count III is based on a contrived syllogism. First, Franklin asserts that the banking industry is a highly regulated one in which the government exercises "pervasive" and "comprehensive" control over S & L's. Compl. at 23 (citing *Fahey v. Mallonee*, 332 U.S. 245, 250, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947); *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 414 (5th Cir.1958)). Second, when an S & L is placed in a conservatorship, the level of governmental control is alleged to increase to the point

where the " 'government exercises literally daily supervision' over the assets of FSA." *Id.* (citing *Mitchell II*, 463 U.S. at 222, 103 S.Ct. 2961.). Third, as a result of this near absolute governmental control, a fiduciary relationship arises between the government and Franklin. *Id.* at 24 (citing *Mitchell,* 463 U.S. at 225, 103 S.Ct. 2961). Fourth, the government's pervasive control of Franklin occurred when the RTC was appointed " 'as a conservator for the Association, not for the purposes of liquidation.'" *Id.* (citing OTS Order No. 90–368 (Feb. 15, 1990)). Fifth, the government allegedly breached its fiduciary duties by:

■ Fail[ing] to maintain deposit base on both retail and brokered basis....

■ Fail[ing] to take steps to ensure that asset integrity and value were maintained and fail[ing] to maximize value in the timely and efficient disposition of the [high yield] bonds.

■ Fail[ing] to challenge, and actually agreeing to, OTS mandated adjustments [the write-downs] even though FSA's accounting methods were consistent with GAAP....

■ Fail[ing] to maximize value in the timely and efficient disposition of securities...

■ Fail[ing] to repudiate timely disadvantageous contracts, including, but not limited to, the $2.9 billion zero coupon bond issuance of 1984....

■ Fail[ing] to repurchase at market debt trading at less than par....

*Id.* Ergo, the government is liable for breach of its duties under *Mitchell II*.[27]

It is important to point out that these allegations are virtually word-for-word the same as those adjudicated by the district court and the Tenth Circuit in *Franklin III*. The doctrines of either *res judicata* or *collateral estoppel* are most probably inapplicable, however, because this court has exclusive

---

**27.** In the complaint, the description of the standard of care owed under Kansas law by an officer or director to the corporation and its shareholders is also alleged. Since the Supreme Court has never looked to state law for the controlling standard of care in the *Mitchell* context, that portion of Franklin's complaint is irrelevant

to disposition of its claims. It is also questionable whether this court would have jurisdiction over Franklin's claim if it derived from state fiduciary law since such a claim is dangerously akin to one sounding in tort. *See* 28 U.S.C. § 1491(a) (2000) (limiting this Court's jurisdiction to claims "not sounding in tort").

jurisdiction over *Mitchell* type claims and thus, Franklin could not have raised such a claim in the previous courts.[28] *See Golden Pac. Bankcorp v. United States,* 15 F.3d 1066, 1073–1074 (Fed.Cir.), *cert. denied,* 513 U.S. 961, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994) (holding claim preclusion inapplicable where claim sought to be precluded was not jurisdictionally cognizable in prior court), *and Jackson Jordan, Inc. v. Plasser Amer. Corp.,* 747 F.2d 1567, 1576 (Fed.Cir.1984) (noting exception to doctrine of *collateral estoppel* where "the party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action").

Aside from the doctrines of *res judicata* and *collateral estoppel,* the government argued that Franklin's claim was fatally flawed because Franklin's analogy of Indian law to banking law "bordered on the absurd." Def.'s Mot. for Summ. J. at 29. It was implausible, the government asserted, to claim that the same sort of protections afforded to the historically "dependant and sometimes exploited" Native Americans also protected sophisticated businessmen such as bankers. *Id.* at 29–30 (quoting *Mitchell,* 463 U.S. at 225, 103 S.Ct. 2961); *and see, Seminole Nation v. United States,* 316 U.S. 286, 296, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942). Moreover, the government contended that the trust relationship giving rise to the government's fiduciary duties was unique to the Indian law context, and did not apply anywhere else. *Id.* at 30.[29]

The genesis of the *Mitchell* trust doctrine is the Supreme Court's decision in *United States v. Mitchell,* 445 U.S. 535, 100 S.Ct.

1349, 63 L.Ed.2d 607 (1980) (*Mitchell I* ). At issue in *Mitchell I* was whether the Indian General Allotment act of 1887, ch. 199, 24 Stat. 388 (repealed 2000) (GAA) authorized the award of money damages against the United States for alleged mismanagement of forests located on land allotted to Indians under the GAA. The Court noted that the doctrine of sovereign immunity would ordinarily bar such a suit unless the government had unequivocally waived such immunity. *Mitchell I,* 445 U.S. at 538, 100 S.Ct. 1349 (citing *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)). The waiver in this case came under the "Indian Tucker Act," 28 U.S.C. § 1505, which gives this court jurisdiction to hear:

> any claim against the United States ... in favor of any tribe, band, or other identifiable group ... whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Claims if the claimant were not an Indian Tribe, band or group.

28 U.S.C. § 1505 (2000).

The Supreme Court further noted, however, that the Indian Tucker Act was strictly a jurisdictional statute and did not confer any substantive rights or claims against the United States. *Mitchell I,* 445 U.S. at 538, 100 S.Ct. 1349 (citing *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)). As such, the tribal claimants had to look beyond the Indian Tucker Act for a waiver of sovereign immunity that conferred a substantive right to sue the government. *Id.* Such a right, plaintiffs argued,

---

**28.** See *infra* note 29.

**29.** The issue of whether a *Mitchell* type trust extends beyond the federal government's relationship with Native American tribes has never been squarely addressed by the U.S. Supreme Court. As discussed more fully below, under the "Indian Tucker Act," 28 U.S.C. § 1505, which is the jurisdictional predicate for all *Mitchell* type claims, this court can exercise jurisdiction over claims brought by Native Americans against the government in the same manner as any other litigant. Since Franklin undoubtedly cannot claim Native American status, this court has no jurisdiction over Franklin's claim under the rather unique Indian Tucker Act. On the other hand,

if Franklin's factual allegations underlying its breach of trust claim can be made to fit under the Supreme Court's holdings in *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) and *Army and Air Force Exchange Service v. Sheehan,* 456 U.S. 728, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982), also discussed more fully below, this court may indeed have jurisdiction over Franklin's claim, albeit under the more general section 1491 of the Tucker Act. In any event, it is unnecessary to resolve this jurisdictional dilemma because this court makes the dispositive finding that Congress did not intend FIRREA to establish a *Mitchell* type trust with regulated banking entities such as Franklin.

arose out of the GAA's language stating "the United States does and will hold the land thus allotted ... in trust for the sole use and benefit of the Indian to whom such allotment shall have been made."[30] 24 Stat. 389. Since the government was to hold the allotted land in trust, the Native Americans argued they should have a substantive right to sue for breach of that trust if the government mismanaged their lands.

The High Court disagreed. After examining the purpose and legislative history of the GAA, the Court held that it "created only a limited trust relationship between the United States and the allottee that does not impose any duty upon the Government to manage timber resources." *Mitchell I*, 445 U.S. at 542, 100 S.Ct. 1349. This was so, the Court continued, because a standard element of a trust was lacking in the GAA since "the Indian allottee, and not a representative of the United States [was] responsible for using the land." *Id.* Moreover, the legislative history indicated that Congress decided to hold the land in trust "not because it wished the Government to control use of the land and be subject to money damages for breaches of fiduciary duty, but simply because it wished to prevent alienation of the land and ensure that allottees would be immune from state taxation." *Id.* at 544, 100 S.Ct. 1349. The Court concluded that any right of the Native Americans to recover against the government had to come from a source other than the GAA. As a result, the case was remanded to the Court of Claims for consideration of other potential sources. *Id.* at 546, n. 7, 100 S.Ct. 1349.

On remand, the Court of Claims held that the timber management statutes, 25 U.S.C. §§ 406, 407, and 466, along with various other statutes and regulations imposed more specific fiduciary duties on the United States in its management of forests on allotted lands. *Mitchell v. United States*, 229 Ct.Cl. 1, 664 F.2d 265 (1981) (en banc).

In affirming the Claims Court, the Supreme Court in *Mitchell II* distinguished the "bare trust" seen in *Mitchell I* from the government's specific responsibilities under the timber management statutes. The Court noted that Congress explicitly instructed the Secretary of the Interior ("Secretary") to consider "the needs and best interests of the Indian owner and his heirs," and specifically required consideration of:

(1) the state of growth of the timber and the need for maintaining the productive capacity of the land for the benefit of the owner and his heirs, (2) the highest and best use of the land, including the advisability and practicality of devoting it to other uses for the benefit of the owner and his heirs, and (3) the present and future financial needs of the owner and his heirs.

*Mitchell II*, 463 U.S. at 222–224, 103 S.Ct. 2961 (citing 25 U.S.C. § 406(a) (2000)).

In addition, the Court noted that the legislative history of the statutes highlighted the unique trust relationship between the United States and the Native Americans. In examining the legislative history of section 466 of the timber management statutes, the Court noted that "the purpose of the provision was 'to assure a proper and permanent management of the Indian forest' under modern sustained-yield methods so as to 'assure that the Indian forests will be permanently productive and will yield continuous revenues to the tribes.'" *Mitchell II*, 463 U.S. at 221, 103 S.Ct. 2961 (quoting 78 Cong. Rec. 11730 (1934) (statements of Representative Howard)). Similarly, the Court noted that Rep-

---

**30.** A longer portion of the act was quoted by the Court:

Upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made ... and that at the expiration of said period the United States will convey the same by patent to said Indian ..., in fee, discharged of said trust and free of all charge or encumbrance whatsoever: Provided, That the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void.

resentative Howard, the co-sponsor of the Act now codified as 25 U.S.C. § 466, in referring to the relationship between the government and the Indians as a "sacred trust," stated that "[t]he failure of their governmental guardian to conserve the Indians' land and assets and the consequent loss of income or earning power, has been the principal cause of the present plight of the average Indian." *Id.* (citing 78 Cong. Rec. 11726).

Having determined the forest management statutes and their legislative history established more than the "bare trust" of *Mitchell I*, the Court held the statutes provided the tribal claimants with a substantive right to sue the Government for breach of its fiduciary duties in managing the Indian forest lands. In the Court's words, the timber management statutes along with other statutes and regulations could "fairly be interpreted as mandating compensation by the Federal Government for damages sustained." *Id.* at 226, 103 S.Ct. 2961.

The Supreme Court this term revisited *Mitchell I* and *II* in *United States v. Navajo Nation*, 537 U.S. 488, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003), when it addressed whether the Navajo Nation could sue the government to recover money damages for an alleged breach of trust in connection with the Secretary's approval of a coal lease between the tribe and a private mining company. The specific issue was whether the Indian Mineral Leasing Act (IMLA), 52 Stat. 347, 25 U.S.C. § 396(a) (2000) *et seq.* created the judicially enforceable fiduciary duties seen in *Mitchell II*.

In holding that it did not, the Court clarified the analysis under *Mitchell I* and *II* for claims brought under the Indian Tucker Act. First, "a Tribe must identify a substantive source of law that establishes specific fiduciary duties, and allege that the government has failed faithfully to perform those duties." *Navajo Nation*, 123 S.Ct. at 1082 (citing *Mitchell II*, 463 U.S. at 216–217, 219, 103 S.Ct. 2961). If that threshold is passed, the Court continued, "the court must then determine whether the relevant source of substantive law can 'fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties…'" *Id.*

(citing *Mitchell II*, 463 U.S. at 219, 103 S.Ct. 2961). In examining the latter point, the Court noted that although the existence of a general trust relationship between the United States and Indian people can reinforce a finding of fiduciary responsibility, that alone is insufficient for imposing liability on the government. *Id.* Rather, "the analysis must train on specific rights-creating or duty imposing statutory or regulatory prescriptions." *Id.*

Applying this analysis to the IMLA, the Court held that it did not impose fiduciary duties on the government because "the Secretary is neither assigned a comprehensive managerial role nor … invested with responsibility to secure 'the needs and best interest of the Indian owner and his heirs.'" *Id.*, 123 S.Ct. at 1082 (citing *Mitchell II*, 463 U.S. at 224, 103 S.Ct. 2961). In addition, and important to the case at bar, the Court examined whether the imposition of fiduciary duties on the government would run contrary to the purpose of the statute:

> Moreover, as in *Mitchell I*, imposing fiduciary duties on the Government here would be out of line with one of the statute's principal purposes. The GAA was designed so that the allottee, and not the United States, … [would] manage the land. Imposing upon the Government a fiduciary duty to oversee the management of allotted lands would not have served that purpose. So too here. The IMLA aims to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties. As the Court of Federal Claims recognized, the ideal of Indian self-determination is directly at odds with Secretarial control over leasing.

*Id.* (internal quotations omitted) (internal citations omitted).

The same day the Court decided the *Navajo Nation* opinion, it also decided *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003). The issue in *White Mountain Apache* was whether the government was liable for failing to maintain the Fort Apache military post inside the Apache reservation. The fort, which dated beck to 1870, was held

"in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the interior to use any part of the land and improvements for administrative or school purposes for as long as are needed for the purpose." Pub.L. 86–392, 74 Stat. 8 (1960) (1960 Act).

The Court initially analyzed whether the 1960 Act imposed substantive fiduciary duties on the government. Two facts were of particular importance. First, the 1960 Act invested the government with discretionary authority to make specific and direct use of portions of the trust corpus by giving the Secretary power to "use any part of the land and improvements for administrative purposes for as long as they are needed for the purpose..." *White Mountain Apache Tribe*, 123 S.Ct. at 1133 (internal quotations omitted). This grant of power, the Court held, was even more plenary than that seen in *Mitchell II* because it allowed the government to not only exercise daily supervision over the trust corpus, but daily occupation of it. *Id.* Second, despite the absence in the 1960 Act of specific management and conservation directives like those seen in *Mitchell II*, the Court noted that "the fact that the property occupied by the United States is expressly subject to a trust supports a fair inference that an obligation to preserve the property improvements was incumbent on the Untied States as trustee." *Id.*

In light of the strong trust relationship created by the above facts, it was clear to the Court that the 1960 Act could fairly be interpreted as inferring compensation, and therefore "it naturally follows that the government should be liable in damages for breach of its fiduciary duties." *Id.*, 123 S.Ct. at 1134.

Of additional importance to the case at bar was the Court's indication that an express statutory authorization of a damages remedy against the government is required where there are strong indications Congress did not intend to create a fiduciary trust relationship. The government in *White Mountain Apache* argued that the 1960 Act could not fairly be interpreted as mandating compensation because Congress did not explicitly provide for a damages remedy if the government violated the statute. *Id.*, 123 S.Ct. at 1135. In

support of its argument, which the Court ultimately rejected, the government cited *Army and Air Force Exchange Service v. Sheehan*, 456 U.S. 728, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982) and *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

In *Testan*, two government attorneys sued under the Tucker Act claiming that they were improperly classified under the Classification Act, 5 U.S.C. § 5101 *et seq.* as "GS–13" government employees and therefore received less salary than their "GS–14" colleagues despite doing substantially similar work. The Court held that the Court of Claims did not have jurisdiction over the case because neither the terms of the Classification Act nor its legislative history indicated Congress intended to change the longstanding rule that "one is not entitled to the benefit of a position [i.e., the higher salary of a GS–14 employee] until he has been duly appointed to it." *Testan*, 424 U.S. at 402, 96 S.Ct. 948. As a result, absent a provision expressly making the United States liable for refusing to change the plaintiff's pay status, the Classification Act could not be fairly interpreted as money mandating.

Similarly, in *Sheehan*, the plaintiff sued under the Back Pay Act, 5 U.S.C. § 5596(b)(1), after he was dismissed from the Army and Air Force Exchange Service (AAES) for violating state drug laws. Although the Back Pay Act normally permitted such a recovery, it expressly exempted AAES personnel. As a result, Congress' intent to deny plaintiff's recovery was clear, and thus, absent an express provision in the statute granting otherwise, the Court held the statute was not money mandating. *Sheehan*, 456 U.S. at 740, 102 S.Ct. 2118.

The controlling rule from *Sheehan* and *Testan* was interpreted by the Court in *White Mountain Apache*:

Sheehan and *Testan*... [are] cases without any trust relationship in the mix of relevant fact, but with affirmative reasons to believe that no damages remedy could have been intended, absent a specific provision.... Thus, ... we required an explicit authorization of a damages remedy because of strong indications that Con-

gress did not intend to mandate money damages. Together they show that a fair inference will require an express provision, when the legal current is otherwise against the existence of a cognizable claim.

*White Mountain Apache Tribe,* 123 S.Ct. at 1135.

Viewed *in toto,* the *Mitchell* line of cases requires the plaintiff to show that their case falls into one of two categories. The first is the classic *Mitchell II* category requiring plaintiff to show a substantive source of law that imposes specific fiduciary duties on the government, and which can fairly be interpreted as mandating compensation when breached, even where there exists no explicit money mandating provision. *Navajo Nation,* 123 S.Ct. at 1091. The second set is the *Testan/Sheehan* category in which there is "no trust relationship in the mix of relevant facts" and Congress has provided "strong indications" that it did not intend the source of substantive law to be money mandating. *White Mountain Apache Tribe,* 123 S.Ct. at 1135. In this latter category, a plaintiff must point to an express provision within the source of substantive law which authorizes a statutory damages remedy against the government. *Id.*

Franklin's claim does not fall within the *Mitchell II* category for several reasons. First and foremost is that the banking statutes relied on by Franklin do not provide a substantive source of law which imposes fiduciary duties on the government. *Mitchell I* and *II* make clear that the existence of a *Mitchell* type trust relationship turns largely on Congress' intent to create such a relationship through the purpose of statute. In *Mitchell I,* the GAA indicated Congress' intent to create a trust relationship since the purpose of the statute was to allow "the United States [to] hold the lands thus allotted in trust for the sole use and benefit of the Indian to whom such allotment shall have been made." 25 U.S.C. § 348 (repealed 2000).

In contrast, the purpose of FIRREA and the general banking regulations is, *inter alia:* (1) to strengthen the enforcement powers of Federal regulators of depository institutions, (2) to strengthen the civil sanctions and crim-inal penalties for damaging depository institutions and their depositors, and (3) to curtail investments and other activities of savings associations that pose unacceptable risks. 103 Stat. 187, Title I, § 101. These purposes are not only diametrically different from the purpose of the GAA, but are antithetical to the notion of the government acting as anything other than a regulating body. It thus strains credulity to assert that the purpose of FIRREA was to establish the government as a *Mitchell* type trustee for the benefit of failed S & Ls or their holding companies. Indeed, the primary entity that Congress intended to protect in enacting FIRREA was the American taxpayer.

This was borne out in *Franklin I* where the Tenth Circuit noted that Congress, in passing FIRREA, intended to give the Director substantial power and broad discretion in regulating S & Ls with only a limited judicial check on that power:

> There exist compelling reasons for [FIRREA]: A savings association's assets consist principally of its depositors' funds; assets can be quickly dissipated; liabilities may be just as quickly created; and liquidity may suddenly disappear. If there is inadequate capital to absorb losses, the losses fall upon the FDIC, and if these funds are depleted, then upon taxpayers. For these reasons, Congress made clear it expects the director to be vigilant and responsive. The close supervision, broad discretion and quick response directed by FIRREA dictates a narrow and limited scope of review....

*Franklin Sav. Ass'n,* 934 F.2d at 1137.

This legislative directive "to be vigilant and responsive," that is aggressive, in regulating S & Ls is a far cry from the legislative directive in the GAA that the United State hold allotted land in a "bare trust" for the use and benefit of Native Americans. It is an even further cry from the legislative mandate in 25 U.S.C. § 406 at issue in *Mitchell II,* which directs the Secretary of Interior to "consider the needs and best interests of the Indian owner and his heirs..." 25 U.S.C. § 406 (2000); *and see Mitchell II,* 463 U.S. at 224, 103 S.Ct. 2961.

'In addition, as the Court noted in *Navajo Nation*, fiduciary duties should not be imposed on the government where it would be inconsistent with the principle purpose of the statute. Considering that one of FIRREA's primary purposes is to imbue the Director with substantial power and discretion in regulating S & Ls, it would be inconsistent with that purpose to impose fiduciary duties on receivers that could clearly curtail that very discretion and power. For these reasons, it cannot be said that FIRREA and the attendant banking regulations promulgated under that act create even the "bare trust" seen in *Mitchell I.*

It is also for similar reasons that Franklin's claim does not fall within the *Testan/Sheehan* line of cases. As *White Mountain Apache* makes clear, in "cases without any trust relationship in the mix of relevant fact, but with affirmative reasons to believe that no damages remedy could have been intended, ... an explicit authorization of a damages remedy [is required] because of strong indications that Congress did not intend to mandate money damages." *White Mountain Apache Tribe*, 537 U.S. 465, 123 S.Ct. at 1135. Since, as shown above, it is clear that Congress did not intend to create a judicially enforceable trust in FIRREA and the banking regulations, *Testan* and *Sheehan* require an explicit authorization of a damages remedy within the text of the statutes. No such authorization appears in any of the statues asserted by Franklin.

Finally, the cases Franklin cites to substantiate its *Mitchell* type trust claim are inapposite. The first, *Gollehon Farming v. United States*, 207 F.3d 1373 (2000), actually works against Franklin since it reiterates the requirement under *Mitchell* that there be some congressional intent to create a trust indicated in the statute. In *Gollehon*, farmers operating grain elevators regulated by the government sued the government under a breach of trust theory. As part of its regulatory responsibility, the government measured the protein content of all grain to ensure its quality. When the government changed its measurement technology, the protein content in plaintiff's grain could not meet the new standard resulting in a loss of sales. Citing *Mitchell II*, plaintiffs alleged that the Grain Standards Act, 7 U.S.C. § 71 *et seq.* (2000), and its concomitant regulations, placed the Department of Agriculture in a fiduciary relationship with the farmers. Finding the analogy to *Mitchell* "inapposite," the Court of Appeals for the Federal Circuit held that the Grain Standards Act did not establish pervasive governmental control over wheat production and distribution, and therefore nothing in that Act indicated the government assumed the responsibility to ensure that farmers such as plaintiff received a minimum financial return on their wheat.

This same reasoning applies to the case at bar since nothing in FIRREA demonstrates congressional intent to create a fiduciary duty whereby government must assure profits when seizing an S & L. Thus, Franklin is confronted with precisely the same road block discussed above—imposing an enforceable trust relationship on the government in this case is simply antithetical to the regulatory purpose and congressional intent of FIRREA and the banking statutes in general.

The same analysis mandates rejecting Franklin's second case, *Koshian v. United States*, 1990 WL 201584 (W.D.N.Y.1990). In *Koshian*, plaintiffs deposited $5000 into the "Postal Savings System" which was established by Congress in 1910 to provide depositors with safe depositories before the advent of federally insured deposits. The government terminated the Postal Savings System in 1966 and sent public notice to all depositors to remove their funds. Plaintiffs, having failed to receive such notice, never claimed their funds and, in 1990, sued for the value of the funds plus interest.

The court held that the organic statute of the Postal Savings System, as well as its accompanying regulations, established the United States as trustee of the deposited funds. Unlike FIRREA, the statute in *Koshian* could reasonably be construed to establish a trust. For example, the relevant statutory provisions in *Koshian* referred to a trust. Indeed, section 1322 of the act was entitled "payments of unclaimed *trust fund* amounts and refund of amounts erroneously deposited." 31 U.S.C. § 1322 (2000) (empha-

sis added). And section 1321(b)(1) of the same act read "[a]mounts ... [from the unclaimed deposits] received by the *United States Government as trustee* shall be deposited in an appropriate *trust fund* account in the Treasury." 21 U.S.C. § 1321(b)(1) (2000) (emphasis added). These provisions arguably demonstrate a congressional purpose to establish both a trust and a fiduciary relationship between the government and the depositors of the now defunct Postal Savings System, circumstances wholly foreign to FIRREA. Consequently, *Koshian* is simply inapposite.

Franklin's third and final asserted case is *Juda v. United States*, 6 Cl.Ct. 441 (1984). In this proceeding, the inhabitants of the Bikini Atoll in the Marshall islands sued the government for damages stemming from the H-bomb thermonuclear tests performed on the atoll during the 1940s and 1950s. In addition to asserting a claim under the Takings Clause of the Fifth Amendment, the Bikinians asserted a breach of an implied-in-fact contract claim, arising from a series of acts by the United States including the removal of the Bikinians from their homeland to a neighboring atoll until the tests were completed. Under this implied contract, the Bikinians contended that the government implicitly promised to protect their health and economic well-being until the tests were completed. It was further argued that the Bikinians became a beneficiary of the United States and must be cared for under the government's fiduciary duty until the Bikini Atoll became habitable again.

The Claims Court agreed, and held that the government breached its fiduciary duties when it decided to allow the Bikinians to reinhabit the atoll before it was safe to do so. In so holding, the Claims Court pointed out that it would ordinarily not have jurisdiction over fiduciary duty claims because the Tucker Act did not grant the court jurisdiction over tort claims. *see* 28 U.S.C. § 1491(a) (2000). Nevertheless, because the implied contract obligated the government to act as a fiduciary, any breach of the fiduciary relationship would also constitute a breach of contract and would thus be cognizable in the Claims Court.

Whether one could stuff the holding of the *Juda* case into the *Mitchell* doctrine alleged by Franklin is not all that clear. Nevertheless, *Juda* too is inapplicable because no implied-in-fact contract exists between the government and Franklin in the case at bar. In fact, no implied-in-fact contract was even alleged by Franklin. And even if Franklin did make such an allegation, it would expire for the same reasons that slew its claim for breach of an express contract discussed above—there is no showing of the necessary elements of a government contract. *See Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997); *Lewis v. United States*, 70 F.3d 597, 600 (Fed.Cir. 1995); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990) (requiring in government contracts mutuality of intent to contract, consideration, lack of ambiguity in offer and acceptance, and actual authority of the government representative whose conduct is relied upon to bind the government in contract).

Finally, the court must note the implications of Franklin's argument. Underlying Franklin's breach of a *Mitchell* type trust claim is the hypothesis that pervasive regulation of an industry or endeavor creates a fiduciary relationship between the United States and the regulated entity. This, of course, stands the premise of regulation—to protect the health, safety and morals of the public—on its head. Since the flowering of regulation of the economy in the nineteenth century, restrictions on business, agriculture and labor for the common good has been the rationale of rule-making and the administrative state. Imposing a trust relationship as Franklin would have the court do, instead, creates a contradictory result because the regulated, not the public, becomes the beneficiary of the legislation. This is the underpinning of Franklin's hypothesis. Franklin is here simply complaining of what Congress wrought: enactment and implementation of FIRREA. And FIRREA was promulgated to protect depositors and ultimately the American taxpayers from fallout stemming from the S & L crisis of the late 1970s and early 1980s. Perhaps Franklin is correct and that ultimately it could have run its S & L

better than the conservator. After all, there is much truth to the argument that many times regulation may be too onerous. But this disagreement is with Congress, and ultimately, that is where relief here ought to be sought. Courts may not under our Constitution second guess the wisdom of legislation.

### D. *Franklin's Motion for Reconsideration*

Also before the court is Franklin's motion to reconsider this court's dismissal of its takings claim. As stated above, the court granted the government's motion to dismiss the takings claim, in part holding that the Federal Circuit has never upheld a claim that a seizure of a financial institution under the statutes and regulations designed to insure safe and secure banking institutions constituted a taking. *Franklin Sav. Corp. & Franklin Sav. Ass'n v. United States,* 46 Fed.Cl. 533, 535 (2000) (*citing Branch v. United States,* 69 F.3d 1571, 1575 (Fed.Cir.), *cert. denied,* 519 U.S. 810, 117 S.Ct. 55, 136 L.Ed.2d 18 (1996); *Golden Pac. Bankcorp v. United States,* 15 F.3d 1066, 1073–74 (Fed. Cir.), *cert. denied,* 513 U.S. 961, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994); *California Housing Secur., Inc. v. United States,* 959 F.2d 955, 958 (Fed.Cir.), *cert. denied,* 506 U.S. 916, 113 S.Ct. 324, 121 L.Ed.2d 244 (1992)).

In essence, Franklin argues that the subsequent U.S. Supreme Court decision in *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), overturned the above cited Federal Circuit precedents *sub silentio.* The court does not read *Palazzolo* in such a manner. Simply put, *Palazzolo* involves neither banking regulations nor banking institutions. As a general proposition of law, it can be cited for various propositions, such as interpretations of the ripeness doctrine, (*Palazzolo,* 533 U.S. at 621–624, 121 S.Ct. 2448) the so-called notice rule, (*Palazzolo,* 533 U.S. at 628–630, 121 S.Ct. 2448) and for the existence of a partial regulatory taking (*Palazzolo,* 533 U.S. at 630–632, 121 S.Ct. 2448). None of these propositions of law seem particularly relevant to this case.

### III. Conclusion

For the foregoing reasons, defendant's motion for summary judgment is GRANTED and plaintiffs' cross-motion for summary judgment is DENIED. In addition, plaintiffs' motion for reconsideration of this court's dismissal of the takings count is also DENIED. Consequently any remaining arguments or motions proffered by the parties are moot. Accordingly, the Clerk of the Court is hereby ordered to enter final judgment on behalf of the United States.

**IT IS SO ORDERED.**

No costs awarded.